[No. 12719. *En Banc.* April 22, 1915.]

THE STATE OF WASHINGTON, *on the Relation of Lucy R. Case, Plaintiff,* v. I. M. HOWELL, *as Secretary of State, Respondent.*[1]

CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAW—CLASSIFICATION. The legislature may, as an exercise of the police power, enact laws which do in fact discriminate between citizens or classes of citizens, whenever the given legislation bears a reasonable relation to the preservation of the public peace, health, safety, or to the promotion of general welfare, since the constitutional prohibition against enactments denying equal protection of the laws to any citizen is no more vital and mandatory than the essential attribute of government to make laws protecting and promoting the general welfare.

STATUTES—ENACTMENT—REFERENDUM—EXCEPTIONS. The purpose of the exception to the power of referendum as guaranteed by the state constitution is to preserve unimpaired the right of the legislature to exercise the police power, without the delay attendant on a referendum of the law to the people, only in such cases where the necessity of its exercise may be emergent, and this question of emergency, in cases of doubt, should be treated as a legislative one, and the doubt resolved in favor of the declaration of emergency made by the legislative body.

[1]Reported in 147 Pac. 1162.

Statutes—Enactment—Referendum—Exceptions. Only laws invoking those certain, definite, and unquestioned phases of the police power which, in their very nature, usually are emergent, as those necessary for the immediate preservation of the public peace, health, or safety, and such measures as are essential to the preservation of these things, namely laws necessary for the support of the state government and its existing public institutions, have been excepted by the seventh amendment of the state constitution from the operation of the referendum.

Constitutional Law—Police Power—Judicial Question. Whether a given law is in reality a proper exercise of the police power is ultimately a judicial, not a legislative, question; and the necessity for a judicial check upon the exercise of the police power is not changed by the mere fact that certain phases of the power are selected and made an exception to a new constitutional guaranty.

Constitutional Law—Police Power—Validity of Act—Presumptions. When the propriety of an exercise of the police power is called in question, every presumption should be indulged in favor of the constitutionality of the legislation.

Statutes — Enactment — Referendum — Exceptions. An act to protect from depletion by transfer or diversion funds collected by cities of the first class from sale of bonds or otherwise for any local improvement by special assessment, and the proceeds of bonds or other obligations authorized by a vote of the people for any special improvement or purpose, in its scope being intended to cover depletion of funds devoted to highway, sewage, and disposal of garbage purposes, as well as other purposes, directly relates to the preservation of the public health or safety, and may be reasonably deemed as so emergent in its character, as to warrant the legislature in enacting its immediate taking effect.

Statutes—Enactment—Presumptions as to Validity. Necessity for the enactment of a law prohibiting the diversion or transfer of special funds as a temporary loan is apparent, when it is an open question whether such transfer could be enjoined under a prior law.

Application filed in the supreme court March 29, 1915, for a writ of mandamus to compel the secretary of state to file an act proposed for submission to a referendum vote.    Denied.

*James E. Bradford*, for plaintiff.

*The Attorney General* and *W. T. Dovell*, for respondent.

Ellis, J.—This is an original application for a writ of mandate to compel the secretary of state to file five copies of

an act of the recent legislature, called the Renick bill, to-
gether with the affidavit as provided by law relating to the
referendum.

The respondent seeks to justify his refusal to file these
papers on the single ground that the bill went into effect on
its approval by the governor on February 26, 1915, by rea-
son of the declaration in the act that it is necessary for the
immediate preservation of the public peace, health and safety,
and shall take effect immediately. The relator contends that
the bill upon its face shows that it has no reasonable relation
to these things, and is therefore subject to the referendum.

The act in question, so far as here material, is as follows:

"An act relating to cities of the first class and prohibiting
therein the diversion of revenues secured for special purposes
to other funds or uses, and declaring an emergency.

"Section 1. That whenever any city of the first class
shall levy and collect moneys by sale of bonds or otherwise for
any local improvement by special assessment therefor, the
same shall be carried in a special fund to be used for said
purpose, and no part thereof shall be transferred or diverted
to any other fund or use.   .   .   .

"Sec. 2. That whenever the issuance or sale of bonds or
other obligations of any city of the first class shall have been
authorized by vote of the people, as provided by any exist-
ing charter or laws, for any special improvement or purpose,
the proceeds of the sale of such bonds including premiums
if any shall be carried in a special fund to be devoted to the
purpose for which such bonds were authorized, and no por-
tion of such bonds shall be transferred or diverted to any
other fund or purpose:   .   .   ." Laws 1915, p. 43.

Section 3 declares that any ordinance, resolution, order or
other action, and every city warrant or other instrument
made in violation of the act, shall be void, and every officer,
agent, or employee of any such city, and every private person
or corporation who shall knowingly commit or aid in any
violation of the act, shall be liable to the city for all money
so transferred, diverted or paid out, which liability shall be

enforcible against the official bond of any such officer, agent, etc.

"Sec. 4.   This act is hereby declared to be necessary for the immediate preservation of the public peace, health and safety, and shall take effect immediately." Laws 1915, p. 44.

The ultimate question for decision is this: Are the provisions of this bill so related to the immediate preservation of the public peace, health and safety or the support of the state government or its existing public institutions as reasonably to fall within the exception to the reserved power of referendum, as found in the seventh amendment to the state constitution? The constitutionality of the act in other particulars is not in issue, and will not be considered.

That amendment, section 1, article 2, subdivision "c," declares:

"No act, law, or bill subject to referendum shall take effect until ninety days after the adjournment of the session at which it was enacted."

Subdivision "b" of the same section declares:

"The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions."

In order to simplify the discussion of the ultimate question, it may not be amiss to indulge certain general observations as to the purpose and character of the exception to the power of referendum reserved to the people by that amendment.   Much confusion will be avoided by recognizing the plain fact that this is not the usual general emergency provision, but an *exception* to the otherwise universal application of the reserved power of referendum.

The constitution forbids the enactment of any law which shall deny to any citizen equal protection of the laws.   That

guaranty is as vital and mandatory as the guaranty of the right of referendum reserved by the seventh amendment, but no more so. But the power to make laws necessary to protect and promote the general welfare is an essential attribute of government. The legislature may, therefore, enact laws which do in fact discriminate between citizens or classes of citizens whenever the given legislation bears a reasonable relation to the preservation of the public peace, health, safety, or to the promotion of general welfare. Such laws are sustained as an exercise of the police power, which has been characterized as "the power inherent in every sovereignty . . . the power to govern men and things." *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466.

The clear purpose of the exception to the reserved power of referendum is to preserve unimpaired the right of the legislature to exercise this police power, but only in so far as it may be emergent. As pointed out in *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11, the exception does not extend to all things touching the general welfare. It does not extend to things relating to mere public expediency or public convenience. It is not as broad as the police power, which is so broad and so variant with time and circumstance that its limits cannot be defined.

"To say that the police power can only be exercised in given cases, and then call a halt, would be to fix a limitation which, from the very nature of the power itself, cannot be done." *Bowes v. Aberdeen,* 58 Wash. 535, 109 Pac. 369, 30 L. R. A. (N. S.) 709.

See, also, *Tacoma v. Boutelle,* 61 Wash. 434, 112 Pac. 661; *State v. Mountain Timber Co.,* 75 Wash. 581, 135 Pac. 645; *Commonwealth v. Alger,* 7 Cush. 53; *Slaughter House Cases,* 83 U. S. 36; *Stone v. Mississippi,* 101 U. S. 814; *Champer v. City of Greencastle,* 138 Ind. 339, 35 N. E. 14, 46 Am. St. 390, 24 L. R. A. 768.

Many acts of the legislature touching things directly relating to the general welfare, and hence falling unquestionably within the broad police powers, are in no sense emergent. A conspicuous example in this state is presented in the act of March 14, 1911 [Laws 1911, p. 345; 3 Rem. & Bal. Code, § 6604-1 *et seq.*] known as the workmen's compensation act, which is as far reaching and pervasive an exercise of the police power as can be found. Another is the act of March 20, 1913 [Laws 1913, p. 413; 3 Rem. & Bal. Code, § 7069-1 *et seq.*] known as the trading stamp act, which was passed subsequent to the adoption of the seventh amendment to the constitution and was sustained solely on the ground that it was a proper exercise of the police power. *State v. Pitney,* 79 Wash. 608, 140 Pac. 918.

But neither of these acts contained any declaration of an emergency, and obviously they were not emergent in any sense. Manifestly many acts involving the exercise of the police power in its broad sense relate to matters of public policy, which are, of all laws, the very kind most appropriate to be referred to the people and which the people would most desire to pass upon because they are put forth in the interest of the general welfare "in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion." *Noble State Bank v. Haskell,* 219 U. S. 104.

The framers of the seventh amendment to our state constitution, and the people by its adoption, have, therefore, selected and excepted from the operation of the referendum, only laws invoking those certain, definite and unquestioned phases of the police power which, in their very nature, may be and usually are emergent—in general terms "such laws as may be necessary for the immediate preservation of the public peace, health or safety," and specifically such measures as are essential to the preservation of these things, in that government is so essential; namely, laws necessary for "support of the state government and its existing public institutions." While this last phase of the exception may

include some revenue laws and some appropriation laws, that is not the line of cleavage. The clear intention was to include within the exception any and all laws, and only such, as may be necessary for such support.

It is obvious that, had the courts at the start abdicated the power to pass upon the constitutionality of any act asserted by the legislature to be an exercise of the police power, every guaranty of the constitution, whether relating to life, liberty, property, or the equal protection of the laws, might long since have been overridden and made a dead letter by mere legislative fiat. Happily no court has done so, but all courts of review, both state and Federal, have uniformly and consistently held that, whether a given act is in reality a proper exercise of the police power is, in its ultimate, a judicial—not exclusively a legislative—question. Neither the character of the police power, nor the necessity for a judicial check upon its exercise, is changed by the mere fact that certain phases of the power are selected and made an exception to a new constitutional guaranty. It is still a judicial question. We so held in the *Brislawn* case, in which, quoting from the California Court of Appeals in *McClure v. Nye*, 22 Cal. App. 248, 133 Pac. 1145, we said:

"The said legislative declaration has no greater effect, and is no more binding upon the court, than if the legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine. The question before us is simply one of construction or interpretation of an act of the legislature and of a provision of the constitution, and that is a judicial question."

What, in a given case, is a proper exercise of the police power is always a difficult question, by reason of the undefined nature of the limits of that power, but it is certainly no more difficult when applied to the narrower phases of the power which are made, by the seventh amendment, exceptions to the referendum than it is in its broader and general scope.

Being of the same nature, however, it must be determined on the same principles.

It may be asserted, as a general rule applicable to every phase of the police power, whether emergent or not, that, when the propriety of its exercise is called in question, the power will be sustained whenever the given measure has any "real substantial relations to the general good and welfare." *Sweet v. Rechel*, 159 U. S. 380.

"Every presumption should be indulged in favor of the constitutionality of the legislation." *Home Tel. & Tel. Co. v. Los Angeles*, 211 U. S. 265.

"If a state of facts can reasonably be presumed to exist which would justify the legislation, the court must presume that it did exist and that the law was passed for that reason. If no state of circumstances could exist to justify the statute, then it may be declared void because in excess of the legislative power." *State v. Pitney*, 79 Wash. 608, 140 Pac. 918.

We have already recognized the clear analogy, and declared the same rule, as to attempted legislative exception of laws from the operation of the referendum.

"If the act be doubtful, the question of emergency will be treated as a legislative question, and the doubt resolved in favor of the declaration of emergency made by the legislative body." *State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 Pac. 11.

See, also, *State ex rel. Case v. Howell, post* p. 294, 147 Pac. 1159. Applying this principle to the statute here in question, can it be said that, indulging every presumption in favor of its constitutionality, the act has no reasonable relation to the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions? We think not.

It will hardly be questioned that the municipalities of the state, in the exercise of all those functions relating to the public peace, health, and safety, in short in the exercise of their police powers, are but arms, auxiliaries, or agencies of the state, performing governmental functions and exercising

sovereign powers of the state. As said by the supreme court of the United States touching the relation between the state and its municipalities:

"Such corporations are the creatures, mere political subdivisions, of the state for the purpose of exercising a part of its powers. They may exert only such powers as are expressly granted to them, or such as may be necessarily implied from those granted. What they lawfully do of a public character is done under the sanction of the state. They are, in every essential sense, only auxiliaries of the state for the purposes of local government." *Atkin v. Kansas*, 191 U. S. 207.

See, also, *Railroad Co. v. County of Otoe*, 16 Wall. 667; *Trustees of Schools v. Tatman*, 13 Ill. 28; *People v. California Fish Co.*, 166 Cal. 576, 138 Pac. 79; *City of Santa Monica v. Los Angeles County*, 15 Cal. App. 710, 115 Pac. 945; *Mayor and City Council of Baltimore v. Root*, 8 Md. 95, 63 Am. Dec. 692; *Scott v. Laporte*, 162 Ind. 34, 68 N. E. 278, 69 N. E. 675.

While these decisions are broader in their assertion of legislative control over the affairs of municipal corporations than would be warranted in this state, by reason of the fact that our cities are guaranteed a large measure of local self-government by the constitution, they are none the less authority on the issue here, that municipalities, in all their governmental functions, are agencies of the state exercising sovereign powers of the state. *State ex rel. Clausen v. Burr*, 65 Wash. 524, 118 Pac. 639; *Meehan v. Shields*, 57 Wash. 617, 107 Pac. 835.

The highways of the state include the streets in the cities of the state. The streets are therefore subject to the paramount and primary control of the legislature. The existing highways of the state constitute one of the state's existing public institutions. *State ex rel. Blakeslee v. Clausen, ante* p. 260, 148 Pac. 28; *Cheney v. Barker*, 198 Mass. 356, 84 N. E. 492, 16 L. R. A. (N. S.) 436, quoted with approval

in *Brandt v. Spokane & Inland Empire R. Co.*, 78 Wash. 214, 138 Pac. 871, 52 L. R. A. (N. S.) 760.

"As the highways of a state, including streets in cities, *are under the paramount and primary control of the legislature,* and as all municipal powers are derived from the legislature, it follows that the authority of municipalities over streets, and the uses to which they may legitimately be put, depends, within constitutional limitations, entirely upon their charters or the legislative enactments applicable to them." 3 Dillon, Municipal Corporations (5th ed.), § 1161.

The power of the city to levy special assessments to pay for the improvement and maintenance of streets is referable solely to the sovereign power of taxation, delegated to it by the state under direction of the constitution, art. 7, § 9; Rem. & Bal. Code, § 7507, subds. 10, 13 (P. C. 77 § 83). *Malette v. Spokane,* 77 Wash. 205, 137 Pac. 496, 51 L. R. A. (N. S.) 686.

"However, it is now settled in the Federal courts, and in the courts of last resort of practically every state of the Union which recognizes the power of special assessment, except Colorado, that all such assessments are laid under the taxing power." Hamilton, Law of Special Assessments, p. 38, § 49.

In the construction and maintenance of the street, the city performs a governmental function through the exercise of sovereign power of the state.

"Familiar examples of such governmental duties are the duty of preserving the peace, and the protection of property from wrong-doers, the construction of highways, the protection of health and the prevention of nuisances." *Hart v. City of Bridgeport,* 13 Blatchf. (U. S.) 289, 293, Fed. Cas. No. 6,149.

"The opening, construction and maintenance of public highways is purely a governmental function, whether done by the state directly or by one of its municipalities. for which the state is primarily responsible. And it is immaterial whether such public work is paid for by the state, the county, the city, or by the benefited property owners. It is a work of

a public, not private, character. The manner of payment does not change the character of the work." *Byars v. State,* 2 Okl. Cr. 481, 102 Pac. 804, Ann. Cas. 1912 A. 765.

It will be noted that the Renick act is intended to protect from depletion by transfer or diversion two kinds of funds of cities of the first class; (1) funds collected by sale of bonds or otherwise for any local improvement by special assessment; (2) proceeds of bonds or other obligations of such cities authorized by a vote of the people for any special improvement or purpose. By a simple paraphrase of either of these provisions, it becomes manifest that they protect funds essential to the immediate preservation of the public health or public safety, and at least one of the existing public institutions of the state. Suppose the first section read:

"That whenever any city of the first class shall levy and collect moneys by sale of bonds or otherwise for (the construction of a sewer system) by special assessment therefor, the same shall be carried in a special fund to be used for said purpose, and no part thereof shall be transferred or diverted to any other fund or use;"

no one would say that such a statute would not directly relate to the preservation of the public health or safety, and no one can say that it would not be reasonably necessary to the *immediate* preservation of these, since an adequate sewer system is a constant and continuing necessity, hence always an immediate one to any city.

A like paraphrase of the second section might also include a plant for disposition of garbage, and adequate means for the disposition of garbage is also a present and continuing, hence an immediate necessity. And again, by inserting the words "public streets, bridges and highways" in each of these sections as the specific purpose of the fund, it is obvious that the act would then protect a fund intended to support a part of one of the state's existing institutions, namely, an integral and essential part of the state's system of highways. It is true that neither section of the act is thus limited to

these specific purposes, but both sections include these pur-
poses in general terms; hence the act is intended to protect
from depletion funds devoted to these purposes as well as
others.   The act thus clearly falls within the exception to
the referendum as a law which "may be necessary for the
immediate preservation of the public  . . .  health or
safety, support of  . . .  existing public institutions."
At least we cannot say that, on its face, it has no reasonable
relation to those purposes which is, as we have seen, the judi-
cial test of the proper exercise of the police power.

Finally, the relator's argument that there is no necessity
for the Renick act in that a diversion of special funds may be
enjoined under the prior law, does not meet the case.   Under
the prior law, as declared in *Griffin v. Tacoma*, 49 Wash. 524,
95 Pac. 1107, and *Scott v. Tacoma*, 81 Wash. 178, 142 Pac.
467, temporary transfers from one fund to another were per-
missible.   True, neither of these cases related to transfers
from special funds, but whether transfers as loans from spe-
cial funds would be sustained as valid is an open question,
in the light of those decisions.   Looking, then, to the old
law, the mischief, and the remedy, it is clear that the Renick
act is intended to prevent a depletion, not only by permanent
"diversion," but also by "transfer" as a loan or for any other
purpose, of any fund created in the manner and for the pur-
poses mentioned in that act.

The writ is denied.*

MAIN, HOLCOMB, and PARKER, JJ., concur.

MORRIS, C. J., MOUNT, and CROW, JJ. (concurring)—We
concur in the result because in our opinion the question of
emergency is a legislative and not a judicial question.

CHADWICK, J. (concurring)—I had been disposed to hold
that the Renick bill did not fall within the exceptions to the

---

* N. B.—For dissenting opinion of Judge Fullerton, see *ante* p.
276.—Rep.

constitution, but Judge Ellis' argument has at least raised a doubt in my mind, and following the accepted rule in such cases, I have decided to concur in his opinion.

Judge Fullerton reargues the main case. It seems to me that he has failed to appreciate our holding. It is not a question whether an act is emergent, as a matter of fact, but whether it falls within the exceptions to the seventh amendment. This is a complete answer to Judge Fullerton's general dissent in the *Blakeslee* case (*State ex rel. Blakeslee v. Clausen, ante* pp. 260, 276, 148 Pac. 28). Suppose, for instance, the legislature passed an act plainly impairing the obligation of an antecedent contract and should specifically declare that it had not done so. This would raise a mixed question of law and fact which from the earliest history of our jurisprudence, courts have assumed to pass on; a power which Judge Fullerton indorses, citing the case of *Marbury v. Madison*, 1 Cranch 137, *et alterius*. To say that in the one case we pass upon a fact, and in the other that we do not, is a refinement so subtle that I confess my inability to mark or measure it. Neither does the opinion in the *Blakeslee* case deny the right of referendum upon bills carrying an appropriation. We have there sufficiently marked the distinctions which naturally arise under the constitution, and this feature of his dissent requires no comment.