[Nos. 30222, 30223. *En Banc.* April 29, 1947.]

THE STATE OF WASHINGTON, *on the Relation of William J. Pennock, Plaintiff*, v. BELLE REEVES, *as Secretary of State, Respondent.*[1]

[1]Reported in 179 P. (2d) 961.

*Caughlan & Hatten (L. Presley Gill,* of counsel), for relator.

*The Attorney General* and *Lyle L. Iversen, Assistant,* for respondent.

MILLARD, J.—These are original applications, consolidated for hearing and opinion, made in this court for the issuance of a writ of mandamus to compel the secretary of state to accept filings for referendum of parts of chapter 288 and chapter 289 of the Laws of 1947. The secretary of state refused to accept the filings on the ground that chapters 288 and 289, *supra,* each contained an emergency clause declaring the act to be necessary for the immediate preservation of the public peace, health, and safety.

Chapter 288, p. 1356, of the Laws of 1947 relates primarily to the old-age assistance program. Chapter 289, p. 1363, relates to the general assistance program. Each statute is amendatory of prior statutes on the same subject. In each case, the legislature changed eligibility requirements, curtailed the amount of assistance given, eliminated certain persons from the public welfare rolls, and included in each act an appropriation to carry on the program as set forth in the act.

Section 3 of chapter 289, p. 1365, Laws of 1947, amends chapter 216, p. 864, Laws of 1939, as amended by chapter 128, p. 379, Laws of 1941, and chapter 172, p. 550, Laws of 1943, by adding new sections, one of which (§ 17-a) reads as follows:

"General assistance shall be granted under the provisions of this act on the basis of actual need, taking into account the income, resources and maintenance available to the individual from whatever source derived and his necessary expenditures, and the facts and circumstances existing in each case. There is hereby appropriated from the General Fund to the State Department of Social Security the sum of twenty-four million dollars ($24,000,000), or so much thereof as may be necessary, to provide general assistance in accordance with the provisions of this act and other laws governing the matter: *Provided,* That the total obligations or payments made from this appropriation during the six

month period immediately following the effective date of this act shall not exceed the sum of six million dollars ($6,000,000) and the total obligations or payments made during any succeeding three month period shall not exceed an amount equal to the proportion of the unobligated balance of this appropriation which said three.month period bears to the remaining months in the biennium: *Provided futher,* That any reduction in any grant to stay within the provisions hereof shall apply ratably to all grants of the same class. . . ."

Section 4, chapter 288, p. 1359, Laws of 1947, which amends § 3, chapter 7, p. 25, Laws of 1945 (Rem. Supp. 1945, § 9998-38 [P.P.C. § 921-9]), makes an appropriation of eighty-five million dollars for payment of senior citizen grants and carries a proviso that the payments made during any succeeding three-month period shall not exceed an amount equal to the proportion of the unobligated balance of the appropriation which the said three-month period bears to the remaining months in the biennium.

In other words, the two acts provide that, if there is any failure of appropriation to meet the needs of either program during any three-month period, grants of all beneficiaries shall be reduced proportionately during that period. Each act concludes with an emergency clause reading as follows:

"This act is necessary for the immediate preservation of the public peace, health and safety and shall take effect April 1, 1947."

In each case, the relator seeks a referendum, not on the entire act, but on all portions of each act except the words actually making an appropriation and except the emergency declaration. The language of chapter 289 which relator proposes shall be unaffected by the referendum constitutes an entire sentence, but in chapter 288 the language relative to an appropriation constitutes only a portion of a sentence.

Relator concedes that the section of each statute providing for an appropriation is emergent, in that the appropriation is for the support of an existing state institution, but argues that the remainder of the two statutes is referable under the seventh amendment to the state con-

stitution, which provides that the second power reserved by the people is the referendum,

". . . and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, . . ."

■ Paragraph (b) of the seventh amendment to the constitution, after providing that any act, bill, law, or any part thereof passed by the legislature may be subject to referendum, reads as follows:

". . . except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, . . ."

The framers of the seventh amendment to the state constitution advisedly use the language quoted above. The exception deals with a "law" not a "part" of a law, necessary for the immediate preservation of the public peace, support of existing state institutions, etc. It was not intended that an emergency could be picked to pieces. Each emergency measure, however urgent, may contain within its provisions some sentences or clauses which could be picked out and, if examined separately, could be found not to be essential to the emergency purpose. No such result was intended by the framers of the seventh amendment to the constitution.

The constitution authorizes referendum on a part of a law which is subject to referendum, but it does not contemplate a law partially subject to referendum and partially not subject to referendum. That is obvious from the above-quoted portion of paragraph (b) of the seventh amendment to the constitution.

■ A partial referendum may not be had on a law which admittedly contains emergent matter. The appropriation in each act under consideration contains an appropriation for the support of an existing public institution, hence the section in each statute carrying an appropriation for existing institutions of the state government is not subject to referendum. The seventh amendment to the constitution contains no requirement that the legislature shall make a declaration of an emergency or that a measure is necessary

for the support of the state government. Art. II, § 31, of the constitution as originally written, provided that:

"No law, except appropriation bills, shall take effect until ninety days after the adjournment of the session at which it was enacted, unless in case of any emergency (which emergency must be expressed in the preamble or in the body of the act) the legislature shall otherwise direct by a vote of two-thirds of all the members elected to each house; . . ."

The section of the constitution, as originally written, which required the emergency to be expressed in the preamble or in the body of the act, was repealed by the seventh amendment to the state constitution.

In *State ex rel. Case v. Howell,* 85 Wash. 281, 147 Pac. 1162, we held that a law providing for the support of the state government and its existing institutions is not subject to referendum, even if the legislature makes no declaration of emergency in such act.

In *State ex rel. Robinson v. Reeves,* 17 Wn. (2d) 210, 135 P. (2d) 75, 146 A. L. R. 280, we held that, under the seventh amendment to the state constitution, all acts passed by the legislature are subject to the referendum except those in exercise of the police power and those providing for the support of the state and its existing institutions. In other words, a legislative declaration that the measure is necessary for the support of the state government is not essential to protect the measure from referendum if the measure in fact is one for the support of the state government.

■ If there is any section or portion of a statute which the court can say is an emergency, a referendum cannot be permitted of the entire act or of all of the act except the emergency portion of the act. *State ex rel. Short v. Hinkle,* 116 Wash. 1, 198 Pac. 535. See, also, *State ex rel. Boatmen's Nat. Bank v. Webster Groves Sewer Dist.,* 327 Mo. 594, 37 S. W. (2d) 905.

■ In each of the statutes in the cases at bar is a declaration that the act is necessary for the immediate preservation of the public peace, health, and safety. We have consistently held that such legislative declaration of

emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P. (2d) 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption.

■ The legislature adopted the means which it conceived was best adapted to assure to persons really in need of public assistance, an adequate amount of money for maintenance of themselves in health and safety and to protect the public by eliminating those privations which we held in *State ex rel. Hamilton v. Martin, supra,* can menace the public peace. There is nothing of which we can take judicial notice to establish the fact that the two statutes are not necessary for the immediate preservation of the public peace, health, and safety.

We agree with counsel for respondent that a referendum may not be permitted as to either of the statutes before us, for the reason that each is an emergency measure necessary for the support of an existing state institution. The emergency content affects the entire statute in each case. The constitution does not expressly authorize, nor is there any language in the constitution which impliedly sanctions, a delay of the effective date and permitting a referendum on portions of emergency legislation which the sponsors of a referendum may conceive not to be essential to the emergency portions of a law.

The writ is denied in each case.

STEINERT, ROBINSON, and SIMPSON, JJ., concur.

JEFFERS and ABEL, JJ., concur in the result.

SCHWELLENBACH, J. (concurring in the result)—I concur in the result arrived at by the majority, but on a different ground. I do not believe that there was an emergency.

Originally the people, as a representative government,

enacted laws through the legislature. Art. II, § 1, of the state constitution provided:

"The legislative powers shall be vested in a senate and house of representatives, which shall be called the legislature of the state of Washington."

In 1912, the people enacted the seventh amendment to the constitution, by which they amended Art. II, § 1, reserving unto themselves the right to initiate legislation, and also to refer to themselves, for approval or rejection at the polls, "any act, item, section or part of any bill, act or law passed by the legislature." Judge Chadwick, in commenting on this amendment in *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 Pac. 920, said:

"It is well known that the power of the referendum was asserted, not because the people had a willful or perverse desire to exercise the legislative function directly, but because they had become impressed with a profound conviction that the legislature had ceased to be responsive to the popular will. They endeavored to, and did—unless we attach ourselves to words and words alone, reject the idea upon which the referendum is founded, and blind ourselves to the great political movement that culminated in the seventh amendment—make reservation of the power to refer every act of the legislature with only certain enumerated exceptions."

Knowing that emergencies might arise, making necessary the immediate taking effect of certain laws, the people wisely inserted in the amendment the provision that any act, bill, law, or any part thereof might be referred, "except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions."

Prior to the enactment of the amendment, all laws, except appropriations and emergencies, took effect ninety days after adjournment of the session. Art. II, § 31, of the constitution provided:

"No law, except appropriation bills, shall take effect until ninety days after the adjournment of the session at which it was enacted, unless in case of any emergency (which emergency must be expressed in the preamble or in the

body of the act) the legislature shall otherwise direct by a vote of two-thirds of all the members elected to each house; said vote to be taken by yeas and nays and entered on the journals."

The amendment struck §§ 1 and 31 from Art. II, and inserted in lieu thereof the provisions mentioned. The emergency clause was re-enacted, although more specific language was used. Subd. (c) of Art. II, § 1, provides:

"No act, law, or bill subject to referendum shall take effect until ninety days after the adjournment of the session at which it was enacted. . . ."

So now, as before, under the constitution, no law shall take effect until ninety days after adjournment, unless some emergency exists which makes its immediate going into effect necessary. The emergency must be such that it must go into effect at the time of the passage of the law, rather than ninety days after adjournment.

I have been unable to find any case where this court was called upon to determine whether or not there was an emergency under the original § 31 of Art. II. But since the enactment of the amendment, the question of emergencies has been before us several times, and we have scrutinized the entire act in those cases to determine whether or not an emergency actually existed. We have done this because we felt it was our duty to protect the people in their constitutional right to refer laws passed by the legislature. The last two cases before this court involving an emergency, were *State ex rel. McLeod v. Reeves*, 22 Wn. (2d) 672, 157 P. (2d) 718, and *State ex rel. Kennedy v. Reeves*, 22 Wn. (2d) 677, 157 P. (2d) 721. The first case involved the appointment of a state game commission, and the second, the creation of a state timber resources board. These two acts were passed by the 1945 legislature, upon the recommendation of Governor Wallgren, and both acts contained emergency clauses. It was held by this court that no emergencies existed, and that the people were entitled to a referendum in each case. In the latter case, we said:

"The case, of course, revolves entirely around the subject of emergency clauses and their effects. That there is a great

deal of confusion of thought as to this subject, has been amply demonstrated by recent events, a confusion to which this court has in some measure contributed, as was acknowledged in the comparatively recent decision in *State ex rel. Robinson v. Reeves,* 17 Wn. (2d) 210, 135 P. (2d) 75, in commenting on our former decision in *State ex rel. Short v. Hinkle,* 116 Wash. 1, 198 Pac. 535. It would seem that we have arrived at a point where it is well to heed the admonition which the people, in adopting our constitution in 1889, attached to the first article of the instrument, which article is entitled 'Bill of Rights':

" '§ 32.  A frequent recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government.' 1 Rem. Rev. Stat., p. 389.

"The very first section of that bill of rights is pertinent to our present discussion.  It reads as follows:

" '§ 1.  All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.' 1 Rem. Rev. Stat., p. 347.

"In article II, sec. 1, of the constitution, the people created the legislature and made to it a full and complete delegation of their inherent legislative power:   .  .  .

"But, in 1912, the people amended article II, § 1, and took back into their own hands a great deal of that power; in fact, a great deal more, we think, than has been generally realized.   .  .  .

"We think it too clear to require argument that the legislature cannot defeat the constitutional right, reserved by the people in the introductory paragraph of amendment seven,

" '  .  .  .   at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature,' (1 Rem. Rev. Stat., p. 519.) by *merely* inserting in an act the statement included in chapter 202, p. 579, Laws of 1945, which is assigned by the respondent as the ground for refusing to file the papers and documents presented to her for filing, to wit:

" 'This act is necessary for the immediate preservation of the public peace, health and safety and for the immediate support of the state government and its existing public institutions and shall take effect immediately.'

"Such a label may obviously be utterly and completely false.  It would be scandalous indeed if the constitutional right of referendum could be thwarted by the mere use of false labels.  As was said in argument, 'If this can be done, the right of referendum is a dead letter in this state.'

"The court does not arrogate to itself the power of deciding whether or not an emergency clause is justified. It is forced to deal with, and decide, that question in the ordinary and regular performance of its duties. The instant case is an example. The relators assert that the people have the constitutional right to approve or reject chapter 202, Laws of 1945, at the polls, and that the exercise of that right is being denied them, and they ask the assistance of the court in enforcing it. It, therefore, becomes our judicial duty to decide whether they have that right, and, if we find that they have, to use the appropriate means to enforce it. Unless we can say that the act is, *in fact,* necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government and its existing public institutions, the relators are of right entitled to the writ prayed for. . . .

"In addition to arguments that the law is highly beneficial, which may very well be true, we have been confronted with general statements culled from former decisions as to the strength of the presumptions which should be indulged in in favor of legislative declarations of emergency. With all due respect, and with the earnest desire not to seem either censorious or facetious, we feel that we must say frankly and in all seriousness that the custom of attaching emergency clauses to all sorts of bills, many of which cannot by any stretch of the imagination be regarded as actually emergent, within the meaning of the test laid down in paragraph (b) of the seventh amendment, has become so general as to make it appear, in the light of recent experience, that a number of those statements can no longer be deemed controlling. It, of course, will never be presumed that the legislature deliberately intended to infringe upon a constitutional right."

Can we say that chapters 288 and 289 of the Laws of 1947 are, *in fact,* necessary for the *immediate* preservation of the public peace, or for the *immediate* preservation of the public health, or for the *immediate* support of the state government and its existing public institutions? Can we say that such an emergency exists which requires that these laws go into effect *now,* and that we cannot wait until ninety days after adjournment? Obviously, no. There is no emergency.

Relator seeks to refer all of chapters 288 and 289, except the appropriations. He contends that, by so doing, the old laws will remain in effect until the election on the referendum, and that the appropriations can be used under the old laws. It is true that, under the constitution, the people can refer any act, item, section, or part of any bill. The appropriation provision for chapter 288, p. 1359, is as follows:

" . . . and there is hereby appropriated from the general fund to the Department the sum of eighty-five million dollars ($85,000,000.00), or so much thereof as may be necessary, for the payment of Senior Citizen Grants:"

Had it stopped there, then the people could refer the body of the act, and the eighty-five million dollars ($85,000,000) could be used to administer under the old act, until the referendum was voted upon. But the legislature went further and added:

"*Provided,* That the total obligations or payments made from this appropriation during the six-month period immediately following the effective date of this act shall not exceed the sum of twenty-one million two hundred fifty thousand dollars ($21,250,000), and the total obligations or payments made during any succeeding three-month period shall not exceed an amount equal to the proportion of the unobligated balance of this appropriation which said three-month period bears to the remaining months in the biennium: *Provided further,* That any reduction in any grant to stay within the provisions hereof shall apply ratably to all grants of the same class." (A similar provision is found in chapter 289.)

When the legislature met, it was immediately called upon to appropriate $11,968,575 for social security because of a deficit then existing. This was done in Laws of 1947, chapter 7, p. 19. The social security department requested an appropriation of $147,862,250 for the coming biennium. The governor's estimate was $137,172,560. The legislature appropriated $109,000,000. An examination of the provisos in the appropriations for chapters 288 and 289 makes it manifest that the appropriations of $85,000,000 in chapter 288, and $24,000,000 in chapter 289, were to be paid out in

the administration of the bills as written, and for no other purpose.

I believe that the people could, if they wished, refer the entire act, including the appropriation, and thereby force the calling of a special session to provide funds to administer under the old acts, while the matters were being referred. But when, in adopting the seventh amendment, the people reserved unto themselves the right to refer a part of a bill or act, they must have had in mind that the remainder of the act, not referred, would be operative.

Subd. (d) of the amendment provides:

"The filing of a referendum petition against one or more items, sections or parts of any act, law or bill shall not delay the remainder of the measure from becoming operative."

Here the appropriations are such an integral part of the acts that they cannot be separated from the remainders. To do so would render the acts inoperative. For that reason, I believe that the writs should be denied.

MALLERY, C. J. (dissenting)—I agree with Judge Schwellenbach except upon the question of severability. I dissent.

HILL, J. (concurring in the result)—I approach the writing of this concurring opinion with considerable diffidence. I freely admit that the writers of both the majority opinion and the foregoing concurring opinion may be right in their views, but, since it seems to me that there are certain dangers inherent in both the views expressed, I shall present my own, as briefly as possible.

The majority opinion gives the legislature more power than the seventh amendment to the constitution intended it should have; the concurring opinion limits the power of the legislature more than was intended.

I do not agree with the majority that the legislature can defeat the right of referendum by inserting in any measure an appropriation necessary for the maintenance of an existing public institution. The case of *State ex rel. Short v. Hinkle*, 116 Wash. 1, 198 Pac. 535, relied upon by the majority, goes no further than to say that, if any section or

portion of an act is emergent, the entire act cannot be referred to the people. The court there said:

"There is another reason why the relators must fail in their attempt to refer this act, and that is that they are seeking reference of the entire act, and if there is any section or portion of it of which the court can say there is an emergency their proceedings must fall. If it should be conceded that as to certain sections or portions of the act the court could say, from its judicial knowledge, that the changes made were not necessary for the support of the state government and its existing institutions, yet the relators are making a general attack and are not seeking to refer those sections only which the court might judicially declare not to be emergent."

The court there indicates that the decision in that case might well have been different had the relators been seeking a partial referendum.

I agree with the majority that we must give to the action of the legislature and its declaration of an emergency every favorable presumption. It is true that, in *State ex rel. Kennedy v. Reeves,* 22 Wn. (2d) 677, 157 P. (2d) 721, we said:

"Unless we can say that the act is, *in fact,* necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government and its existing public institutions, the relators are of right entitled to the writ prayed for."

In that case, the emergency "label" was obviously and patently false, but I believe the statement quoted goes too far. The foregoing concurring opinion relies upon this case as authority for our right to say that, unless we can find that an act is, in fact, necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government and its existing public institutions, no emergency exists and the relators are entitled to the writ prayed for. It seems to me that we thereby substitute the supreme court for the legislature in determining whether or not an emergency exists. The presumption should be

that the members of the legislature acted in accordance with their oath of office; but if the act is, in fact, not necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government and its existing public institutions, we should not hesitate to strike the false emergency clause and to hold the act subject to referendum. It never has been necessary for us to go further than that in any case which we have decided.

There is a vast difference between our determining that an act is, in fact, necessary for the immediate preservation of the public peace, etc., and our determining that an act is, in fact, not necessary for the immediate preservation of the public peace, etc. In the first situation, we legislate; in the second, we say to the legislature, you cannot make patently false declarations of fact.

Giving to the legislative declaration of emergency the presumption to which I believe it is entitled, and speaking only for myself, I cannot conscientiously say that some of the parts of chapters 288 and 289, Laws of 1947, which are sought to be referred, are not necessary for the support of the state government. The legislature was confronted with a Herculean task in its effort to balance the state budget. There were, seemingly, two or three claimants for every available dollar. Requests for appropriations had to be scaled down and economies had to be effected. Chapters 288 and 289 of the Laws of 1947 represent an attempt to effect certain savings in the operation of the old age assistance and the general assistance programs. Unless those savings could be effected, the appropriations made for those programs obviously were inadequate, and the financial structure of the state would be imperiled. If an attempt to secure new sources of revenue to balance the state budget makes a measure necessary for the support of the state government and its existing public institutions (*State ex rel. Reiter v. Hinkle,* 161 Wash. 652, 297 Pac. 1071), an attempt to save money and decrease expenditures in order to balance the state budget should make a measure necessary for the

support of the state government and its existing public institutions.

It should be, by this time, a matter of public knowledge that budgets can be balanced by reducing expenditures or by increasing income, and that, in many cases, there is no alternative. The wisdom of the method is not ours to review, but, if that was the purpose, we cannot say that it was not necessary for the support of the state government and its existing institutions, unless we are prepared to say that unbalanced budgets and deficit financing have nothing to do with the immediate support of the state government and its existing institutions.

I do not believe that the legislative declaration of emergency was patently false.

