[No. 42801. En Banc. May 30, 1973.]

THE STATE OF WASHINGTON, *on the Relation of Bruce Kenneth Helm, Petitioner,* v. A. LUDLOW KRAMER, *as Secretary of State, Respondent.*

308

*David T. Kirkland, Richard L. Prout,* and *Thomas D. Coughlin* (of *Hageman, Prout, Kirkland & Coughlin*), for petitioner.

*Slade Gorton, Attorney General, Wayne L. Williams* and *Thomas F. Carr, Assistants,* for respondent.

HUNTER, J.—This is an original proceeding in mandamus to compel the Secretary of State (respondent), to accept for filing the necessary documents tendered by the relator, Bruce Kenneth Helm, for the referendum of Laws of 1973, 1st Ex. Sess., ch. 137, § 110. The relator in his writ alleges full compliance with the statutory and constitutional requirements to entitle him as a taxpayer and legal voter to seek such referendum. The relator states that by reason of the Secretary of State's refusal to accept the documents for filing, he and the people of the state of Washington will be deprived of their constitutional right, reserved to the people of the state of Washington to pass upon this section of the above act at the next general election. The section is as follows:

NEW SECTION. Sec. 110. GENERAL FUND APPROPRIATION TO THE GOVERNOR:

To be allocated by the governor in order to implement salary increases to enable the payment of salaries to the below described elective executive, judicial, and legislative officials according to the schedule of annual salaries prescribed in this section commencing January 1, 1974: PROVIDED, That such increases for legislators

shall not take effect until the first date permitted by
the Constitution of this state............. $ 1,359,059

### Schedule of Annual Salaries
#### Executive Officials

| | |
|---|---|
| Governor ........................ | $ 47,300 |
| Lieutenant Governor ............. | 22,000 |
| Attorney General ................ | 37,950 |
| Superintendent of Public Instruction | 37,950 |
| Commissioner of Public Lands...... | 33,000 |
| Auditor ......................... | 29,700 |
| Insurance Commissioner ........... | 29,700 |
| Secretary of State................ | 26,400 |
| Treasurer ....................... | 26,400 |

#### Judicial Officials

| | |
|---|---|
| Supreme Court ................... | 38,000 |
| Court of Appeals ................. | 35,000 |
| Superior Court ................... | 32,000 |
| Full Time District Court Judges: | |
| PROVIDED, That no funds shall be allocated from this appropriation to implement these salary increases ........................ | 26,000[1] |

#### Legislative Officials

| | |
|---|---|
| Legislators ...................... | 10,560 |

The procedure followed by the legislature for the ulti-
mate adoption of this section was in conformity with the
direction contained in RCW 43.03.028, which provides for
the establishment of a state committee on salaries to consist
of seven members, as follows:

The president of the University of Puget Sound or his
nominee; the president of Washington State University
or his nominee; the chairman of the State Personnel
Board; the president of the Association of Washington
Business; the president of the Pacific Northwest Person-
nel Managers' Association; the president of the Washing-
ton State Bar Association, and the president of the Wash-
ington State Labor Council or his nominee.

---

[1] It is to be noted that district court judges may, strictly speaking,
not be state elected officials. Our reference in this opinion to state
elective officials hence does not include district court judges. We per-
ceive that no issue has been raised as to their severability which we do
not reach.

RCW 43.03.045 provides:

(1) The governor shall include, in the budget next transmitted by him to the legislature after the date of the submission of the report and recommendations of the committee under RCW 43.03.028, his recommendations with respect to the exact annual salaries which he deems advisable for all state elective officials within the purview of RCW 43.03.028. As used in this subsection, the term "budget" means the budget referred to in RCW 43.88.020(1).

(2) The recommendation of the governor transmitted to the legislature in the budget as to such positions shall be carried forth and included in the appropriation act of the state.

The amount of the salaries for which positions as enacted by the legislature, in the appropriation bill, shall be the salary that each respective official shall receive.

In the event the governor makes no recommendation, the salary that each such respective official shall receive shall remain the same.[2]

Pursuant to said section, the Governor transmitted in his budget the recommendations for salaries as fixed by the state committee on salaries, with the exception of the salary provided for members of the legislature in the amount of $10,560 annually, which the Governor reduced in his recommendation to $7,200. The legislature thereupon, in its adoption of the budget for certain state agencies, included therein in section 110, the restoration, to the extent of $10,560, for the annual salary recommended by the state committee on salaries for members of the legislature, and either adopted the Governor's recommendations or made reductions in adjusting the salaries for other state elected officials.

The budget bill concluded with the usual emergency clause for a budget bill as follows:

NEW SECTION. Sec. 134. This act is necessary for the immediate preservation of the public peace, health and safety, the support of the state government and its existing public institutions, and shall take effect immediately:

---

[2]For convenience we will refer to the pertinent statutes relative to the state committee on salaries as the state committee on salaries act.

PROVIDED, That provisions of this appropriations act shall not take effect until the legislature shall have approved the entire 1973-75 biennial budget for the state of Washington.

The constitutional provision, under which the relator seeks to have section 110 referred to the people for their approval or disapproval at the next general election on November 6, 1973, is paragraph (b) of article 2, section 1 as set forth in the seventh amendment to the state constitution:

> (b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, *except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions,* either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted.

(Italics ours.)

The italicized part of the referendum provision is the exception which is commonly known as the emergency clause. In the absence of the emergency clause, no act, bill or law would become effective until 90 days after the adjournment of the session at which it was enacted. Paragraph (c) as contained in our Seventh Amendment so provides: "No act, law, or bill subject to referendum shall take effect until ninety days after the adjournment of the session at which it was enacted. . . ."

Thus, in order for a bill to take effect at an earlier date, it is necessary for the legislature to declare the law to come within the exceptions of article 2, section 1(b) by appending to the bill the customary so-called "emergency clause" containing the exceptions.

The issue then in determining whether a bill is referable by referendum, is whether either of the exceptions contained in the emergency clause can be sustained.

The relator contends the emergency clause cannot be sustained as to section 110, for the reason that there is

no showing by the bill on its face, or by those matters of which we may take judicial notice, that an emergency exists for the increase of salaries of the respective state elected officials. In so doing, he fails to recognize that the emergency clause contains two exceptions, one which relates to the immediate preservation of the public peace, health and safety, and the other for the support of state government and its existing public institutions. It has long been recognized by our decisions in construing this section of the constitution, *supra*, that these are two distinct exceptions—the first as to the existence of an emergency for the preservation of the public peace, health and safety, and the second as to the support of state government and its existing public institutions, irrespective of an emergency.

In the recent case of *State ex rel. Hoppe v. Meyers*, 58 Wn.2d 320, 363 P.2d 121 (1961), involving the testing of an emergency clause in a mandamus proceeding wherein it was sought to refer an act to the people under the referendum provision of our constitution, we clearly delineated the two exceptions. We there stated on pages 326 and 327:

> The word "or" was apparently inadvertently omitted before the word "support," and this court has always construed the section as though that word had not been omitted.
>
> . . .
>
> In that early and leading case [*State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 P. 28 (1915)], we also defined very broadly the meaning of the word support, as it is used in amendment 7, saying that the people intended to use it in its fullest sense, and that,
>
> "In the absence of an express reservation, it would be a usurpation on the part of any court to say that an appropriation directed to the maintenance of the existing activities of the state is subject to the referendum. The first right of government is the right of self-preservation, and to say that the people intended, in the absence of an express reservation, to allow the government or its institutions to be crippled or embarrassed in any way would be to say that the people intended that the government could not sustain itself through the mediumship of the ordinary and recognized methods of legislation."

It was further held in that case that the word "immediate" does not qualify the words "support of the state government and its existing institutions" but only qualifies the words "preservation of the public peace, health or safety."

We therefore need not consider the existence or nonexistence of an emergency in the emergency clause. If section 110 comes within the second exception that the enactment was in support of the state government and its existing public institutions, then the relator cannot prevail irrespective of the existence of an emergency.

■ We even went so far as to state in *State ex rel. Pennock v. Reeves*, 27 Wn.2d 739, 743, 179 P.2d 961 (1947), citing *State ex rel. Case v. Howell*, 85 Wash. 281, 147 P. 1162 (1915):

[T]hat a law providing for the support of the state government and its existing institutions is not subject to referendum, even if the legislature makes no declaration of emergency in such act.

The emergency clause in this case can then be sustained in the event section 110 can be determined to be in support of state government and its existing public institutions without regard to the existence of an emergency. There can be no question but what the biennial budget for 1973-75, in which section 110 is contained, is in support of state government and its existing public institutions. The enactment is implicitly so entitled:

making appropriations and authorizing expenditures for the operations of certain state agencies for the fiscal biennium beginning July 1, 1973, and ending June 30, 1975;
. . .

The issue then is whether section 110 is properly within the state budget. The relator vigorously argues that it is not; that this is not the budget in the traditional sense; that it is truly not an appropriation but an enactment for the increase of salaries of elected state officials. We are satisfied that the relator is in error. This same contention was raised in the early case of *State ex rel. Jones v. Clausen*, 78 Wash. 103, 138 P. 653 (1914). In that case the legislature, in a

general appropriations bill, increased the salary of the deputy state auditor from $1,800 annually to $3,600. We there stated through Mr. Justice Chadwick, on page 105:

> This practice has pertained not alone to the office of deputy state auditor. It has been pursued with reference to almost every employee of the state, especially those who occupy subordinate positions and whose salaries were fixed at a time when they seemed sufficient, but which are admittedly meager when measured by present conditions. The assistants to the attorney general, state treasurer, state auditor, state land commissioner, and secretary to the governor, are but a few of the instances that might be cited. To this practice, the state auditor has hitherto subscribed, and has issued warrants for the amounts fixed in the appropriation bill, notwithstanding the several acts of 1890 fixing the salaries of state officers and their deputies. All of this was within the knowledge of the legislature at the time the act of 1913 was passed. For twenty years and more, it has been the settled practice of the legislative and executive departments of the state to create offices and employments and to fix salaries of new and old officers by simple reference to the office in the general appropriation bill. It has been, and it well should be, the policy of the courts in construing statutes, to ascertain the intent of the legislative branch of the government. No surer search light can be found than the settled practice of the legislative body, for a habit, if tolerated and acquiesced in for a period of years by the people, and if it in no way offends against any provision of the constitution, becomes a *quasi* custom; and of custom, it is said there can be no higher law.

This custom has since been continued as demonstrated by provisions for increasing wages and salaries for certain state employees in the present state agency budget, Laws of 1973, 1st Ex. Sess., ch. 137, §§ 39, 58 and 86, which provide:

> NEW SECTION. Sec. 39. FOR THE BOARD OF VOLUNTEER FIREMEN
>
> Volunteer Firemen's Relief and Pension Fund
> Appropriation: PROVIDED, That after July 1, 1973, the Executive Secretary shall receive $15,000 per annum: PROVIDED FURTHER, That $4,000 be used to conduct an actu-

arial study for volunteer firemen. . . . . . . . . . .$ 65,162
NEW SECTION. Sec. 58. FOR THE STATE PATROL
General Fund Appropriation . . . . . . . . . . . . . . . .$5,290,492
Motor Vehicle Fund Appropriation: PROVIDED, That
$780,000 is included to implement a new salary sched-
ule for commissioned personnel . . . . . . . . . .$40,613,325
NEW SECTION. Sec. 86. . . .

. . .

General-Fund Appropriation: For continuation during
the 1973-75 biennium of the $40 per month salary in-
crease granted to eligible employee groups effective
February 1, 1973 . . . . . . . . . . . . . . . . . . . . . . .$29,000,000
General Fund Appropriation: To provide effective Janu-
ary 1, 1974, sufficient general fund state appropriations
as are necessary to implement 50% of the salary in-
crease for state and higher education classified employ-
ees as contained in the State Personnel Board and
H.E.P.B. July 1972 Salary Survey as updated to July 1,
1973 and for comparable salary increases for employees
of judicial agencies . . . . . . . . . . . . . . . . . . . . .$13,898,615
Special Fund Salary Increase Revolving Fund
Appropriation: There is hereby created in the state
treasury the Special Fund Salary Increase Revolving
Fund which shall be used solely to facilitate payment
of state employee salary increases from special funds,
and the State Treasurer is hereby directed to transfer
sufficient revenue from each special fund to the Spe-
cial Fund Salary Increase Revolving Fund, in accord-
ance with schedules provided by the Office of Program
Planning and Fiscal Management, as required to imple-
ment 50%, effective January 1, 1974, of the salary in-
crease for state and higher education classified employ-
ees as contained in the State Personnel Board and
H.E.P.B. July 1972 Salary Survey as updated to July 1,
1973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$11,300,000
General Fund Appropriation: For a salary increase effec-
tive July 1, 1973, for faculty and exempt personnel of
the four year units of higher education: PROVIDED, That
the amount allocated shall be sufficient to assure an
average salary increase of three and one-half percent
over the average salary rate in effect on February 2,
1973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$7,350,000
General Fund Appropriation: For a salary increase for
faculty and exempt personnel of the community col-

leges: PROVIDED, That the amount allocated shall be sufficient to assure an average salary increase of five percent over the average salary rate in effect September 1, 1973: PROVIDED FURTHER, That these funds be disbursed by the districts in a manner consistent with guidelines prepared by the State Board.....$5,120,514

General Fund Appropriation: For an average five percent salary increase for certificated employees of local school districts effective September 1, 1973: PROVIDED, That it is the intent of the legislature that these funds shall be used exclusively for salary increases, exclusive of increments, for certificated employees and shall be allocated through the school apportionment formula: PROVIDED FURTHER, That if school districts do not grant certificated employees a salary increase equal to an average of 5 percent, exclusive of increments, funds distributed for this purpose through the apportionment formula shall be reduced proportionately ..$42,357,562

General Fund Appropriation: For continuation of the $40 per month salary increase provided February 2, 1973: PROVIDED, That these salary increase funds shall be allocated through the school apportionment formula ....................................$19,114,368
There is appropriated from the following special funds the dollar amounts necessary to continue the $40 per month salary increase granted to eligible employee groups effective February 1, 1973.

In the instant case, in addition to authority for the inclusion of section 110 in the general appropriation budget under the rule of *State ex rel. Jones v. Clausen, supra,* is the express statutory direction that it be included in the 1973-75 biennial appropriation budget by RCW 43.03.045, *supra,* of the state committee on salaries act.

Moreover, our research discloses no limitation in our state constitution or our state statutes limiting the authority of the legislature to provide for increased salaries of state elective officials in the biennial general appropriations budget in support of state government.

There can then be no question but what section 110, *supra,* is lawfully included in Laws of 1973, 1st Ex. Sess., ch. 137, the 1973-75 biennial budget for certain state agen-

cies. Section 110 is therefore an integral part of the aforesaid budget which is clearly in support of state government and its existing public institutions, coming within the second exception of the referendum section of the seventh amendment to our state constitution. That appropriation acts come within this exception as stated in *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 11 (1915), was exhaustively examined and supported in *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 P. 28 (1915). We there said on page 269:

> Michigan provides: "except that the legislature may give immediate effect to acts making appropriations and acts immediately necessary for the preservation of the public peace, health or safety by a two-thirds vote of the members elected to each house." Const., art. 5, § 21.
>
> . . .
>
> *Our constitution is, in meaning, the same as the constitution of Michigan,* but not quite so specific as is the constitution of Colorado. The question whether appropriation bills or bills for the support of the government and its existing institutions should be subject to the referendum being at all times a live topic of controversy pending the adoption of these amendments, we must credit the people with knowing their own purposes and with knowing how to express them. If they had intended that general appropriations or appropriations other than those for current expenses should be subject to the referendum, it would seem that they would have done here as they did in Ohio, reserve the authority to pass upon any item of an appropriation bill; or as they did in California, limit the reservation to all appropriations other than those for current expenses. Our constitutional provision means just what we said in the case of *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 Pac. 11:
>
> "The true rule is: The referendum cannot be withheld by the legislature in any case except it be where the act touches the immediate preservation of the public peace, health, or safety, or the act is for the financial support of the government and the public institutions of the state, that is, appropriation bills."
>
> The intent and purpose of the people, as gathered from the words of the constitution and the circumstances attending the adoption of the seventh amendment, impels

the holding that the people intended to use the word "support" in its fullest sense.

(Italics ours.)

■ Moreover, it is significant to note that the word "support" of state government used in its fullest sense, must include the providing of compensation for state elective officials in state government when reflected by an appropriation. In *State ex rel. Flanagan v. Taylor,* 43 S.D. 264, 268, 178 N.W. 985 (1920), that court there stated:

> Support of the state government certainly implies and embraces all necessary provisions for salaries, compensation, and expenses of its officers and employes.
>
> . . .
>
> . . . It follows that enactments which provide or affect the compensation for existing public officers and employes are for the support of the state government, within the meaning and intent of the constitutional provision under discussion.[3]

Further, in using the word "support" of state government in its fullest sense we turn to the purpose of section 110, as expressly stated in the state committee on salaries act, RCW 43.03.027:

> It is hereby declared to be the public policy of this state to base the salaries of public officials on realistic standards in order that such officials may be paid according to the true value of their services and the best qualified citizens may be attracted to public service. It is the purpose of RCW 43.03.027, 43.03.028, 43.03.040, 43.03.045 and 43.03.047 to effectuate this policy by utilizing the expert knowledge of citizens having access to pertinent facts concerning proper salaries for public officials, thus removing and dispelling any thought of political consideration in fixing the appropriateness of the amount of such salaries.

The purpose of section 110 is therefore obvious: To provide adequate salaries and adjustments on the basis of the

---

[3]We are mindful of the later South Dakota case, *State ex rel. Martin v. Eastcott,* 53 S.D. 191, 220 N.W. 613 (1928), which disaffirms the language of *Flanagan* when it is applied to acts which merely increase salaries and do not appropriate money for the positions. This is not the case here.

elective officers' responsibilities; and to retain and attract the best qualified state elective officials.

To test whether or not this purpose in support of state government and its existing public institutions was in fact implemented by the enactment of section 110, we can take judicial notice of the following statement by the Governor in his budget message:

Finally, I am required by statute to include in the budget my recommendations with respect to the annual salaries deemed advisable for all state elected officials. Salaries of most elected officials were last increased eight years ago; therefore, in this budget I am recommending that executive elected officials receive an interim salary increase equivalent to an eight-year cost of living increase effective January 1, 1973. In addition, I am recommending that salaries paid to Legislators be increased to $7,200, and be received by Legislators after the next election as required by our constitution.

We can take judicial notice of the Consumer Price Index of the United States Department of Labor, Bureau of Labor Statistics, January 1973, page 4, chart 1, all items index and its rate of change, from 1964 to January 1973, which shows an increase in prices on all items from the figure of 95 in 1964 to 127.7 in January 1973.

We can take judicial notice of the overall average of percentage salary increases for Washington state civil service employees for the period of July 1, 1965 through June 30, 1973, as contained in the records of the Department of Personnel of the State of Washington:

| | |
|---|---|
| August 1, 1965 | 4% |
| August 1, 1966 | 6% |
| February 1, 1967 | 13% |
| January 1, 1968 | 4% |
| July 1, 1969 | 12% |
| July 1, 1970 | 4% |
| September 1, 1972 | 3% |
| February 1, 1973 | 5.6% |
| Total increase | 51.6% |

We can take judicial notice of the increased duties and

responsibilities of legislators by the provision for an additional legislative session and the continuation of standing legislative committees during the interim.

■ We can therefore conclude that it was in fact discriminatory to consider increases for state civil service employees consistently each year since 1965, and, with the exception of the judicial officials in 1972, with no increases for state elected officials during that same period; that the adjustment of salaries across the board of all state elected officials was long overdue, and that the legislature was carrying out the legislative direction of the state committee on salaries act in implementing the purposes of that act in support of state government by establishing and adjusting salaries on the basis of cost of living increases, the responsibilities of their office, the increased responsibilities of their office, and on the basis of being reasonably competitive with other comparable employment, in order to retain in and attract the best qualified persons to the respective state elective positions. We believe these matters of which we have taken judicial notice clearly show section 110 was enacted for the purpose of and was in support of state government and its existing public institutions, and does in fact implement that purpose.

For the reasons heretofore stated, there can be no question as to whether section 110 comes within the second exception of article 2, section 1(b) as set forth in the seventh amendment of our state constitution, and cannot therefore be subject to referendum.

The relator's writ must be and is denied.

HALE, C.J., FINLEY, ROSELLINI, HAMILTON, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.

UTTER, J. (concurring)—I concur on the ground stated by the majority that our constitution, as interpreted by our earlier cases, states that a law providing for the support of state government and its existing institutions is not subject to referendum. Our previous cases hold appropriations for salary increases are properly part of the state budget. As

the majority notes, the only authority in this country dealing with the issue of whether appropriations for salaries for state officers and employees are for the support of state government, holds affirmatively on that issue. *State ex rel. Flanagan v. Taylor*, 43 S.D. 264, 178 N.W. 985 (1920). There is no case in our country where constitutional provisions similar to ours have been held to permit a referendum under the circumstances present in this case.