[No. 37787.    Department One.    January 28, 1965.]

*In the Matter of the Petition of* THE CITY OF AUBURN.
THE CITY OF AUBURN, *Respondent,* v. ROY M. HAWKINS *et al.,*
*Petitioners.**

*John J. Keough, Alva C. Long,* and *Thomas E. Agee,* for petitioners.

*Robert M. Smythe,* for respondent.

*Reported in 398 P. (2d) 723.

HILL, J.—Auburn, a city of the third class, seeks to exercise the power given to it to condemn certain property for off-street parking space and facilities for motor vehicles.[1]

In October, 1963, it had, as required by RCW 35.86.050, adopted by Ordinance No. 1645 a comprehensive plan for providing off-street parking space and facilities for motor vehicles. The plan contemplated the acquisition of seven off-street parking lots within the central business district at an estimated cost of $453,533.37; provided that the

". . . entire cost and expense of said improvement shall be borne by and assessed against the properties specially benefited by such improvements . . ."

and designated the territorial extent of the properties to be specially benefited. The ordinance further set the time and place for a public hearing on the comprehensive plan, and stated that thereafter

". . . the City Council may pass an ordinance providing for the financing of said comprehensive plan as herein authorized."

On March 16, 1964, the Auburn City Council passed Ordinance No. 1675,

". . . RELATING TO AND PROVIDING FOR THE ACQUISITION BY CONDEMNATION OF CERTAIN REAL PROPERTIES AND PROPERTY RIGHTS BY THE CITY OF AUBURN FOR THE PURPOSE OF PROVIDING ADDITIONAL FREE OFF-STREET PARKING FACILITIES WITHIN THE CORPORATE LIMITS OF THE CITY."

The ordinance states:

"That public convenience and necessity demand that the City of Auburn acquire ownership of certain tracts of land situate within the corporate limits of the City of Auburn to provide additional free off-street parking facilities for the City pursuant to the comprehensive plan therefor established by Ordinance No. 1645, and pursuant to Ordinance No. 1652[2] of the City, as amended, . . ."

---

[1] RCW chapter 35.86 (Laws of 1961, chapter 186; and Laws of 1959, chapter 302).

[2] A certified copy of Ordinance No. 1645 is in the record; but the record nowhere discloses the provisions of "Ordinance No. 1652 of the City, as amended." If it has materiality, this ordinance should be placed in evidence at the rehearing, which we find to be necessary.

Ordinance No. 1675 directs that:

". . . condemnation proceedings shall be immediately commenced . . . on . . .
"Parcel #1
"Lots 1, 2, 3 and 4, Block 2, Ballard's Commercial Addition to the City of Auburn, King County, Washington.
"Parcel #2
"East 126 feet of North 30 feet of West 406 feet, Tract 11, Riverview Addition to Auburn."

This ordinance was amended June 1, 1964, by adding a new section reading:

"That the entire cost of the improvement provided for herein shall be paid from 'Local Improvement Fund, District No. 155' or from the General Fund of the City of Auburn."[3]

The amended petition for condemnation now before us, filed June 11, 1964, is limited to a portion of Parcel #1, designated in Ordinance No. 1675, *i.e.*, Lots 1 and 2 and the East 20 feet of Lot 3, Block 2, Ballard's Commercial Addition to the City of Auburn.

The record discloses that the portion of Parcel #1 not being acquired by condemnation, has been or can be acquired by purchase.

The statute authorizing the acquisition of off-street parking facilities lays down no standards whatsoever relative to where, when, and under what conditions off-street park-

---

[3]The comprehensive plan (Ordinance No. 1645) did not contemplate payment "from the General Fund of the City of Auburn," but said that the "entire cost and expense of said improvement shall be borne by and assessed against the properties specially benefited by such improvements."

No mention is made by counsel of this deviation from the comprehensive plan, and it may be that "Ordinance No. 1652 of the City, as amended," to which we have referred in footnote 2, made a change in the comprehensive plan as to the method of financing the acquisition of the contemplated off-street parking facilities; or it may be that it was not deemed material on the issue of public use and necessity. We direct attention to the seeming deviation from the comprehensive plan for whatever materiality it may have in subsequent proceedings.

ing facilities may be provided by cities,[4] and, except for some ambiguous references to "making such economic and physical surveys as are necessary," there seem to be no guiding principles for the preparation of "comprehensive plans."[5]

The record is notably quiet, if not silent, as to the necessity for the acquisition of this property as an adjunct to the right to regulate traffic and keep it moving and thus alleviate or prevent the public nuisance of traffic congestion,[6] or as to any specific detriment to the public safety or interest which should be remedied. Indeed, the emphasis here, even in the city's evidence, seems to be the need for adequate free parking for potential customers of downtown businesses.

The property to be condemned was already in use as a privately owned parking facility. The owners offered to prove that in the downtown area the metered parking lots

---

[4]The very general statutory authorization for such condemnation is found in the two sections which follow.

RCW 35.86.010. "Cities of the first, second, and third classes are authorized to provide off-street parking space and facilities for motor vehicles, and the use of real property for such purpose is declared to be a public use."

RCW 35.86.030. "Such cities are authorized to obtain by lease, purchase, donation and/or gift, *or by eminent domain in the manner provided by law for the exercise of this power by cities,* such real property for off-street parking as the legislative bodies thereof determine to be necessary by ordinance. . . ." (Italics ours.)

[5]The only prerequisite for launching forth on the acquisition program is found in RCW 35.86.050:

"In the establishment of off-street parking space and/or facilities, cities shall proceed with the development of the plan therefor by making such economic and physical surveys as are necessary, shall prepare comprehensive plans therefor, and shall hold a public hearing thereon prior to the adoption of any ordinances relating to the leasing or acquisition of property and providing for the financing thereof for this purpose."

[6]These are the reasons usually suggested for the exercise of the police power in taking private property for off-street parking. *Superior Laundry & Towel Supply Co. v. Cincinnati* (1959), 11 Ohio Op. (2d) 350, 168 N. E. (2d) 445; *Larsen v. San Francisco* (1957), 152 Cal. App. (2d) 355, 313 P. (2d) 959; *Lowell v. Boston* (1948), 322 Mass. 709, 79 N. E. (2d) 713.

were rarely filled to more than one-half capacity (though one free parking lot was frequently full), and that the pressure for free parking came from the downtown merchants who desired such parking to enable them to forestall suburbia shopping centers with extensive free parking areas. The city objected to this offer of proof, and the trial court sustained the objection. This was error.

It is true that, within the framework of the statute, the city council had adopted a comprehensive plan and had designated the property sought to be condemned for off-street parking facilities as being required "by public convenience and necessity"; and that the legislature had declared, in RCW 35.86.010, that use of real property for that purpose was a public use. This would seem to support the apparent view of the trial court that the proof offered by the property owners was not material and that the legislature and the city council had made the only requisite determinations.

■ However, our state constitution[7] says that,

". . . whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: . . ."

---

[7]Const. Art. 1, § 16:

"EMINENT DOMAIN. Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, *the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: Provided,* that the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use." (Italics ours.)

The proof offered should have been received and weighed. It may not have weighed enough to affect the result, but it certainly should have been placed on the scales.

There can be no objection to downtown merchants acquiring as much property as they desire for free off-street parking and paying for it themselves. They are entitled to promote their businesses and protect their investments, but they should not be permitted to use the city's power of eminent domain to compel other property owners to part with their properties for that purpose, unless it can also be shown that a "really public" use is being furthered thereby.

■ Nor is there anything inconsistent in the downtown merchants reaping a substantial benefit from the condemnation by the City of Auburn of off-street parking facilities, if that benefit is incidental to a "really public" use, such as alleviating or preventing traffic congestion and thereby promoting the usability of the municipal streets for the purpose for which they were intended, *i.e.*, the movement of traffic. *Larsen v. San Francisco, supra; Court Street Parking Co. v. Boston* (1957), 336 Mass. 224, 143 N. E. (2d) 683; *Barnes v. New Haven* (1953), 140 Conn. 8, 98 A. (2d) 523. In fact, such benefits are the basis for the frequent financing of the acquisition of such facilities through Local Improvement Districts.

We do not here presume to prejudge the issue of public use in this particular case; but we do declare it to be an issue to be determined in the light of all of the evidence, not solely on the basis of a legislative declaration—city or state, or both. Such declarations are entitled to great weight, but they are not conclusive. *Miller v. Tacoma* (1963), 61 Wn. (2d) 374, 378 P. (2d) 464; *Hogue v. Port of Seattle* (1959), 54 Wn. (2d) 799, 341 P. (2d) 171; *State ex rel. Dungan v. Superior Court for Grant Cy.* (1955), 46 Wn. (2d) 219, 279 P. (2d) 918.

■ We suggest another respect in which the record made by the City of Auburn seems to us weak, if not deficient. The comprehensive plan adopted calls for the acquisition by the city of seven parking lots to accomplish a certain purpose. There is no showing of how the acquisition

of this particular lot fits into the comprehensive plan. Have the other six been acquired by purchase, or in some other way, and will the acquisition of this particular lot complete the plan? Is this simply a proper and necessary step in an orderly program of acquisition—a step which in and of itself serves a public purpose and constitutes a "really public" use? Or is it so small a part of the comprehensive plan that its impact on the problem (whatever it may be) is negligible? We refer to these as proper subjects of inquiry because it is necessary to fit any acquisition by condemnation into place within the purview of the comprehensive plan and the city's expressed need for seven parking lots.

It is conceded that this property is being acquired for the purpose of providing free parking (within reasonable time limits), and the question is raised as to whether, by the statute under consideration authorizing the acquisition of property for off-street parking, the legislature intended to permit such acquisition for free off-street parking.

The statute was intended to enable cities to prevent or alleviate traffic congestion and thus to enable streets to serve the purpose for which they were primarily intended, *i.e.,* to enable the traveling public to get from one place to another. In this age of traffic congestion, the right to furnish off-street parking is a necessary adjunct to the right to regulate and control traffic. See *Lavin v. City of Camden* (1961), 71 N. J. Super. 71, 176 A. (2d) 304; *Phillips v. Officials of City of Valparaiso* (1954), 233 Ind. 414, 120 N. E. (2d) 398; and *Lowell v. Boston, supra,* which involved similar statutes.

It is true that the statute recognizes that parking revenue bonds may be issued as a means of financing the acquisition of off-street parking facilities, but there is no suggestion that off-street parking could not be free. Indeed, questions have arisen elsewhere, not from the exercise of a city's right to provide free off-street parking space for the solution of its traffic problems, but as to its right to charge for the off-street parking and thus put such a city, while in the exercise of a governmental function, in a proprietary financial competition with the owners of private parking facili-

ties. It becomes necessary not to justify free off-street parking, but the collection of revenue in the exercise of the police power. *Brodhead v. City and Cy. of Denver* (1952), 126 Colo. 119, 247 P. (2d) 140; *Britt v. Wilmington* (1952), 236 N. C. 446, 73 S. E. (2d) 289; *Opinion of the Justices* (1947), 94 N. H. 501, 51 A. (2d) 836.

We see no objection to the acquisition by the city of free off-street parking facilities. In conclusion, and so that there may be no doubt as to our position, we would make clear that there is no question but that the use of property for off-street parking can be a public use. We are saying, however, that all off-street parking does not necessarily constitute a public use and that the trial court should make a determination of that issue on the basis of the evidence submitted, recognizing that a legislative assertion that a use is public carries great weight but is not conclusive.

We have commented on what we regarded as the weakness of the case presented by the city, with its emphasis on the amount of off-street parking required to accommodate the customers of downtown merchants, rather than the amount of off-street parking required to keep traffic moving and avoid congestion. We have suggested the need of clarification as to whether the method of payment provided in No. 1675 is within the comprehensive plan and as to whether that plan is being followed.

However, the specific reason that this case is being remanded to the superior court for another hearing on the issue of whether a public use has been established, is because of the rejection of the offer of proof: That there was actually no traffic congestion, and that the purpose of the acquisition was primarily to provide free parking space for downtown merchants and to strengthen property values in the downtown area. We have indicated that such an incidental beneficial result to downtown merchants and property owners is in no wise objectionable, but it should not be the primary purpose of the condemnation.

The decree appealed from is reversed, and the case remanded to the superior court for a new trial on the issue of public use and necessity. This will permit the city to make a

stronger case, if it can, and permit the property owners to introduce the proffered proof and to have a determination on the basis of all the material evidence.

The costs of the hearing on this writ of certiorari will be borne by the City of Auburn.

ROSELLINI, C. J., HUNTER and HALE, JJ., and JOHNSON, J. Pro Tem., concur.