947 P.2d 1169 (1997)
133 Wash.2d 455
CLEAN (Citizens for leaders with Ethics and Accountability Now!), a Washington nonprofit corporation; Spokane Research & Defense Fund, a Washington nonprofit corporation; coalition for a new Spokane, a Washington nonprofit corporation; Priorities First, a Washington political committee; Richard Adams, John Talbott, and Margaret Leonard, Appellants,
v.
CITY OF SPOKANE, a Washington first class charter city; the Spokane City Council; and Spokane Public Development Authority, a City of Spokane public corporation, Respondents, and
Citizens Realty Company, a Washington corporation; and Lincoln Investment company, a Washington corporation, Respondents.
No. 65262-7.
Supreme Court of Washington, En Banc.
Argued June 18, 1997.
Decided November 13, 1997.
*1171 Eugster & Haskell, Stephen K. Eugster, Spokane, for Appellants.
Stanley M. Schwartz, Laurie Connelly, Asst. City Attys., Perkins, Coie, Thomas F. Kingen, Witherspoon, Kelley, Davenport & Toole, Duane M. Swinton, Spokane, for Respondents.
*1170 DOLLIVER, Justice.
CLEAN et al. challenge by direct review a Spokane ordinance providing public support for a new parking garage in downtown Spokane.
Respondents/Intervenors Citizens Realty Company and Lincoln Investment Company (Developers) own River Park Square shopping mall and garage in downtown Spokane. In early 1995, the Developers approached the City of Spokane (City) asking for assistance with the renovation and expansion of the mall parking garage as part of a plan to redevelop River Park Square (RPS). The redevelopment includes a new Nordstrom store to replace the existing store on which Nordstrom's lease will expire January 31, 1999. Nordstrom has not stated for the record whether it will remain downtown if the RPS *1172 project fails to materialize. Project proponents predict that the RPS redevelopment will create jobs, increase tax revenue, and improve cultural and recreational opportunities in downtown Spokane.
The Developers will renovate the parking garage and then sell it to the Spokane Downtown Foundation, a nonprofit corporation (Foundation). The Foundation intends to issue tax-exempt bonds on behalf of the City payable from garage revenues. The Foundation will lease the garage to the Spokane Public Development Authority (PDA), which will operate the facility. The Developers will lease the land to the Foundation and the Foundation will assign that lease to the PDA.
When the bonds issued by the Foundation are retired, the City will acquire ownership of the garage at no cost. The City has contingently pledged parking meter revenue to cover the garage operating expenses and the ground lease payments in the event garage revenues are insufficient to meet the facility's expenses.
The City applied for an Economic Development Grant (EDI) and a section-108 guaranteed development loan from the United States Department of Housing and Urban Development (HUD). HUD has awarded the City a $1 million EDI grant. The section-108 loan application was still pending as of the date the Respondents' brief was submitted to this court. The City has pledged its future Community Development Block Grant funds to repay the section-108 loan if the Developers default.
The Developers submitted a State Environmental Policy Act (SEPA) checklist to the City. The City issued a Mitigated Determination of Nonsignificance for the project on July 2, 1996. This decision was not appealed administratively.
On January 27, 1997, the Spokane City Council approved Ordinance C31823 (the Ordinance) which authorizes City support for the RPS garage. On January 30, 1997, Appellant Priorities First presented a referendum petition to the Spokane City Clerk, seeking to overturn the Ordinance. Although referendum proponents collected over 8,000 signatures, the City refused to honor the referendum petition because the City Council declared that an emergency existed when it adopted the Ordinance, rendering the Ordinance effective immediately and precluding a referendum.
CLEAN et al. (Appellants) brought this action in Spokane County Superior Court to challenge several aspects of the City and PDA's participation in the project, seeking declaratory and injunctive relief. The trial court granted summary judgment to the City, PDA and Developers (Respondents). This court granted direct review on May 9, 1997.
The standard of review of a trial court's order granting summary judgment is de novo. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate where the parties' pleadings, affidavits, and depositions establish that there are no genuine issues of material fact and that the movant is entitled to a judgment as a matter of law. Wilson, 98 Wash.2d at 437, 656 P.2d 1030. When considering a motion for summary judgment, the court shall consider the evidence in the light most favorable to the nonmoving party. Wilson, 98 Wash.2d at 437, 656 P.2d 1030.
(1) Has the City acted in excess of its municipal authority under the off-street parking statutesRCW 35.86.050 and RCW 35.86.010?
Appellants first argue the City violated RCW 35.86.050 because it failed to develop a comprehensive parking plan before enacting the Ordinance. The statute provides:
In the establishment of off-street parking space and/or facilities, cities shall proceed with the development of the plan therefor by making such economic and physical surveys as are necessary, shall prepare comprehensive plans therefor, and shall hold a public hearing thereon prior to the adoption of any ordinances relating to the leasing or acquisition of property....
RCW 35.86.050.
Respondents correctly observe that the statute does not discuss the level of specificity required of a comprehensive plan. The only case interpreting RCW 35.86.050 is *1173 In re Petition of City of Auburn, 65 Wash.2d 560, 398 P.2d 723 (1965). In City of Auburn, this court observed that, "there seem to be no guiding principles for the preparation of `comprehensive plans.'" 65 Wash.2d at 563, 398 P.2d 723. Respondents argue that, if the Legislature had so intended, it could have prescribed a very specific set of criteria for municipalities to follow when preparing comprehensive plans under RCW 35.86.050, as is evidenced by the specificity called for in the Growth Management Act (RCW 36.70A.070).
Lacking case law interpreting the level of specificity required by this particular statute, the trial court relied by analogy upon Hutchinson v. Port of Benton, 62 Wash.2d 451, 383 P.2d 500 (1963). In Hutchinson, we held the Port of Benton had satisfied a statutory requirement that it adopt a comprehensive harbor development plan before expanding the port because it had given "a fairly detailed picture" of what the project entailed. Hutchinson, 62 Wash.2d at 457, 383 P.2d 500. We acknowledged that the plan was not a "model of preciseness," but upheld the project because the plan was sufficient to inform the taxpayers of how their money was to be spent. Hutchinson, 62 Wash.2d at 457, 383 P.2d 500.
The trial court in this case held the City had complied with RCW 35.86.050 because the statute does not require a specific checklist but rather a process that provides the public with specific information about the project. Because the City commissioned both a parking study and a financial feasibility study and held three public hearings to elicit comments on the plan, the trial court found the City had complied with RCW 35.86.050.
Respondents point out that, in addition to these measures, the City has adopted a Downtown Spokane Development Plan (Plan), which addresses downtown parking needs. In their Reply Brief, the Appellants claim the RPS facility violates this Plan because the Plan calls for parking at the Davenport Hotel. This assertion is false. The Plan encourages the development of a parking facility "near" the Davenport Hotel and the Opera House/Convention Center. Ex. 6 at 13. The RPS garage is two blocks to the north of the Davenport Hotel.
Appellants' argument that the City violated RCW 35.86.050 is not persuasive. The City has held hearings and commissioned studies for the project and has also established that the facility conforms to the City's comprehensive plan. These steps satisfy the requirements of RCW 35.86.050, given case law defining "comprehensive plan."
Appellants also contend the City lacks the authority to purchase the parking garage because the RCW requires city parking facilities to serve, as their primary purpose, persons who use the park or civic center facilities. RCW 35.86.010 states:
Cities ... are authorized to provide off-street parking space and facilities located on land dedicated for park or civic center purposes, or on other municipally-owned land where the primary purpose of such off-street parking facility is to provide parking for persons who use such park or civic center facilities. In addition a city may own other off-street parking facilities and operate them in accordance with RCW 35.86A.120.
Appellants' argument is without merit. The second sentence of RCW 35.86.010 plainly authorizes a city to own "other off-street parking facilities." Appellants contend that, because this portion of the statute requires such facilities to be operated in accordance with RCW 35.86A.120 and because chapter 35.86A RCW allows cities to establish parking commissions, the City is not allowed to own "other off-street parking" unless it has created a parking commission. RCW 35.86.010 merely states that such facilities must be operated in accordance with RCW 35.86A.120 (which specifies under which circumstances a city may or may not operate one of its parking facilities), not that such a facility can be acquired only after a city appoints a parking commission. The trial court properly found the City was not required to create a parking commission as a prerequisite to owning the RPS garage.
*1174 (2) Has the City failed to comply with the State Environmental Policy Act?
The Developers submitted an environmental checklist to the City as required by the State Environmental Policy Act (SEPA) (RCW 43.21C). The City issued a Mitigated Determination of Non-significance on July 2, 1996. Appellants sought review of this determination in superior court. The trial court barred the SEPA claim after finding that Appellants failed to appeal the City's determination through administrative channels.
A plaintiff alleging noncompliance with SEPA must exhaust administrative remedies before filing suit. Citizens for Clean Air v. City of Spokane, 114 Wash.2d 20, 26, 785 P.2d 447 (1990). Where an agency has an appeal procedure in place, an aggrieved person is required to seek redress under that procedure before seeking judicial review. RCW 43.21C.075(4). The City of Spokane has adopted a specific administrative appeal process for SEPA rulings. See Spokane Municipal Code (SMC) 11.10.170.
Appellants fail to prove or even allege they have done anything to exhaust their administrative remedies. There is no evidence in the record that Appellants filed an administrative appeal. Where the record fails to show that an aggrieved party has attempted to use the administrative appeals process, the court will conclude that no appeal was made. Citizens for Clean Air, 114 Wash.2d at 27, 785 P.2d 447. The trial court therefore properly dismissed the SEPA claim.
(3) Has the City failed to comply with the Growth Management Act?
Appellants assert the City has violated the Growth Management Act (RCW 36.70A.120) by failing to follow its comprehensive plan. The City responds it has yet to adopt a comprehensive plan under the Growth Management Act (the Act) and, therefore, cannot have violated the Act. The trial court agreed and adopted the City's reasoning without elaboration.
The Growth Management Act requires first-class cities to implement comprehensive plans by July 31, 1997. RCW 35.22.695. As of the date of oral argument, Spokane had yet to implement a comprehensive plan under the Act. Because there is no plan in place to violate, the City cannot be said to have violated the Act.
(4) Has the City failed to comply with its comprehensive plan?
Without citing to a specific ordinance, Appellants also contend the City has violated its existing comprehensive plan. Spokane adopted a comprehensive plan in 1983. See chapter 11.20 SMC. The plan allows for a broad range of activities downtown. Appellants argue the RPS redevelopment project violates the comprehensive plan's arterial street plan because it would close Post Street, an arterial.
The City responds that Appellants have identified no section of the arterial street plan that would prohibit the vacation of an arterial. The City contends the RPS project actually furthers the Spokane comprehensive plan because the plan encourages development of projects that attract shopping and entertainment in the downtown area. The City is correct. The Appellants have failed to allege any genuine violation of the Spokane comprehensive plan.
(5) Has the City violated the Clean Air Act?
Appellants next assert the RPS project violates the Washington Clean Air Act (RCW 70.94) because the City has not obtained an air quality conformity determination. Although Appellants do not cite which portion of the statute the City is allegedly violating, they are presumably referring to RCW 70.94.037, which would prevent the City from approving the RPS project without first certifying that the project conforms to the State implementation plan of the federal Clean Air Act. The Respondents claim that project developers prepared an air quality analysis as part of the SEPA review process, and that this analysis concluded that the project and its mitigation measures will actually reduce carbon monoxide emissions.
*1175 Appellants' argument is completely without merit. The Developers prepared an air quality analysis (Ex. 85 at 01805-01822), and the City determined the project conformed to the Clean Air Act.
(6) Does the Ordinance violate article VII, section 1, of the Washington Constitution by failing to serve a public purpose?
Appellants next argue the RPS project violates article VII, section 1 (amend.81), of the Washington Constitution, which states that all taxes "shall be levied and collected for public purposes only." Appellants contend the RPS garage does not serve a public purpose because its expansion is designed solely to meet the retail shopping needs of the renovated RPS, a private entity.
We recently addressed this issue in CLEAN v. State, 130 Wash.2d 782, 792-93, 928 P.2d 1054 (1996). In CLEAN, we held that public development of a major league baseball stadium serves a public purpose even though the Seattle Mariners baseball club, a private entity, would also benefit from the expenditure of public funds. CLEAN, 130 Wash.2d at 792-97, 928 P.2d 1054. We explained:
"An expenditure is for a public purpose when it confers a benefit of reasonably general character to a significant part of the public." In re Marriage of Johnson, 96 Wash.2d 255, 258, 634 P.2d 877 (1981). "Where it is debatable as to whether or not an expenditure is for a public purpose, we will defer to the judgment of the legislature." Anderson v. O'Brien, 84 Wash.2d 64, 70, 524 P.2d 390 (1974).
. . . .
The fact that private ends are incidentally advanced is immaterial to determining whether legislation furthers a public purpose.
CLEAN, 130 Wash.2d at 793 & 796, 928 P.2d 1054 (citation omitted). We acknowledged in CLEAN that the degree to which the baseball stadium would improve the economy and quality of life was "debatable," but held that this question was best resolved by the people's elected representatives. CLEAN, 130 Wash.2d at 796-97, 928 P.2d 1054.
We must therefore defer to the judgment of the Spokane City Council if the public benefit of this project is at least "debatable." The Ordinance contains at least 10 separate paragraphs articulating the reasons why the project will benefit Spokane and meet a public need. Based upon studies, documents, and public testimony, the City found the project would create jobs, stimulate the economy, provide cultural opportunities, increase tax revenue, thwart the economic decline of the downtown area, and improve the quality of life. Given the fact that the City relied upon evidence that the project would confer various benefits, the public benefit of this project is at least debatable. The project meets the public purpose test of article VII, section 1, of the Washington Constitution.
(7) Does the Ordinance constitute a gift or a loan of the credit of the State in violation of article VIII, section 7, of the Washington Constitution?
Appellants next contend the RPS project amounts to a gift of public funds and a lending of credit in violation of the Washington Constitution. Respondents assert that public support for the project does not constitute a gift or a lending of credit because the City will receive a parking garage in exchange for its assistance.
Article VIII, section 7, of the Washington Constitution states:
No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm....
Appellants claim the City is violating this constitutional provision in three ways: (a) the garage lease and ground lease payments to be paid to the Developers are excessively high, and the difference between the negotiated prices and the market prices amounts to an unconstitutional gift; (b) HUD assistance to the Developers is an unconstitutional gift; (c) the pledge of parking meter revenues is an unconstitutional lending of *1176 credit. Because the HUD assistance comes from the federal government, not the City or State, this claim is meritless on its face.
CLEAN v. State employed a two-part test for analyzing potential violations of article VIII, section 7. CLEAN, 130 Wash.2d at 797, 928 P.2d 1054. First, the court asks if the funds are being expended to carry out a fundamental purpose of the government. If the answer to this question is yes, then no gift of public funds has been made. If not, the court focuses on the consideration received by the public and the donative intent of the appropriating body. CLEAN, 130 Wash.2d at 798, 928 P.2d 1054.
Because it is highly questionable that the building of a parking garage for a business district serves a "fundamental purpose" of government, we turn to the second prong of the CLEAN testwhether there was consideration or donative intent. We addressed this issue in City of Tacoma v. Taxpayers, 108 Wash.2d 679, 703, 743 P.2d 793 (1987):
"Unless there is a proof of donative intent or a grossly inadequate return, courts do not inquire into the adequacy of consideration." (Italics ours.) Adams [v. University of Wash., 106 Wash.2d 312, 327, 722 P.2d 74 (1986)].... Absent a showing of donative intent or gross inadequacy, trial courts should only apply a legal sufficiency test, under which a bargained-for act or forbearance is considered sufficient consideration.
Appellants fail to prove either that the City intended to donate public funds to the Developers or that the consideration received for the City's participation in the project is "grossly inadequate." In exchange for its assistance, the City will receive a parking garagean item that would unquestionably constitute legally sufficient consideration. Although Appellants may view the transaction as an unwise use of public funds that unduly benefits the Developers, the wisdom of the plan is not for this court to consider. See Louthan v. King County, 94 Wash.2d 422, 427, 617 P.2d 977 (1980).
Appellants next argue that, even if this court finds the lease payment arrangement is not an unconstitutional gift, we should still hold that the contingent pledge of parking meter revenue is an unconstitutional lending of credit. Again, CLEAN v. State is directly on point. The appellants in CLEAN argued that the Stadium Act amounted to an unconstitutional lending of credit because it was a "`financing conduit for private enterprise.'" CLEAN, 130 Wash.2d at 799, 928 P.2d 1054. We rejected this argument on the basis that the stadium was to remain in public hands. In so holding, we distinguished the case from Lassila v. City of Wenatchee, 89 Wash.2d 804, 576 P.2d 54 (1978), in which we struck down the City of Wenatchee's purchase of property with intent to sell it to a private party. CLEAN, 130 Wash.2d at 799, 928 P.2d 1054. Because the City of Wenatchee in Lassila received nothing of value for its expenditure of public money, it was unconstitutionally acting as a "middle person for a private enterprise." CLEAN, 130 Wash.2d at 799, 928 P.2d 1054. The Stadium Act, in contrast, provided that ownership of the facility would remain in public hands. CLEAN, 130 Wash.2d at 799, 928 P.2d 1054. Because the State was not acting as a financing conduit for a private entity, the Stadium Act did not amount to an unconstitutional lending of credit. CLEAN, 130 Wash.2d at 799, 928 P.2d 1054.
Because the RPS facility will ultimately belong to the City, the City's pledge of parking meter revenues is not an unconstitutional lending of credit under CLEAN. The pledge is clearly not a financing conduit for a private entity because it was made to the PDA, a public entity, for the sake of a publicly-owned facility.
(8) Is the emergency clause of the Ordinance invalid?
When the Ordinance was adopted, the City Council found that "an urgency and emergency exists," and accordingly declared the Ordinance "effective upon adoption in order to preserve the public peace, health or safety and provide support of the City government and its existing public institutions, facilities and infrastructure." Ex. 142 at 10. The fact that the Ordinance became effective immediately precluded a referendum on the project *1177 under section 83 of the Spokane City Charter, which allows for a referendum where the requisite number of signatures are presented to the City "prior to the date when any ordinance shall take effect."
Section 19(a) of the Spokane City Charter provides that certain ordinances "shall take effect immediately upon passage," including:
An ordinance necessary for the immediate preservation of the public peace, health or safety or for the immediate support of city government and its existing public institutions; provided it has in its preamble or body a statement of the facts giving rise to the necessity for immediate effectiveness and it is passed by a vote of one more than a majority of the council[.]
Spokane City Charter § 19(a)(1).
Appellants argue the emergency clause of the Ordinance is invalid and that therefore a referendum is required. Again, CLEAN v. State is directly on point. In CLEAN, this court interpreted article II, section 1(b) (amend. 72), of the Washington Constitution, which subjects all state legislation to referendum except laws that are "necessary for the immediate preservation of the public peace, health or safety." Given that section 19 of the Spokane City Charter is identical in relevant part to the constitutional provision interpreted in CLEAN, CLEAN is controlling.
When reviewing legislative declarations of emergencies, we give substantial deference to the Legislature. "`Legislative declarations of fact, such as the existence of an emergency, are deemed conclusive unless they are "obviously false and a palpable attempt at dissimulation."'" CLEAN, 130 Wash.2d at 808, 928 P.2d 1054 (quoting City of Tacoma v. Luvene, 118 Wash.2d 826, 851, 827 P.2d 1374 (1992)). Where an act is "doubtful" in this regard, the doubt will be resolved in favor of the declaration of emergency. CLEAN, 130 Wash.2d at 808, 928 P.2d 1054. In CLEAN, we found the emergency clause of the Stadium Act was valid because the Legislature was acting on a "clear and present danger" that the Seattle Mariners would leave the state. CLEAN, 130 Wash.2d at 808, 928 P.2d 1054. Since the Legislature could reasonably believe such a result would produce a detrimental economic effect, we deferred to the Legislature's declaration of emergency. CLEAN, 130 Wash.2d at 808-09, 928 P.2d 1054.
Appellants assert CLEAN v. State is inapposite because there is no proof in the record that Nordstrom will leave downtown if the project does not go forward. It is true that Respondents have failed to establish Nordstrom will leave downtown Spokane if the RPS project fails to materialize. Nevertheless, CLEAN v. State requires this court to defer to the City Council's emergency declaration unless it is "obviously false and a palpable attempt at dissimulation." CLEAN, 130 Wash.2d at 808, 928 P.2d 1054 (quoting Luvene, 118 Wash.2d at 851, 827 P.2d 1374).
The City Council found, among other things, that downtown Spokane has "experienced a serious economic decline." Ex. 142 at 4. The Council also found that the RPS project would create jobs, stimulate the economy, provide cultural opportunities, and improve the quality of life in the downtown area. Ex. 142 at 4. The Council further found that commitments from the City and from prospective RPS tenants "must immediately be received" by the Developers in order for the project to be completed on time. Ex. 142 at 5. Because the viability of the RPS project depends upon Nordstrom's presence and the project must begin construction in September 1997 to accommodate the expiration of Nordstrom's lease in 1999, it was arguably necessary for the City to render the Ordinance effective immediately. We cannot say the City's declaration of emergency is either "obviously false," or a "palpable attempt at dissimulation."
(9) Has the City violated City Charter section 85 by failing to honor the petition for a referendum?
Appellants next contend the City has violated Spokane City Charter § 85(a), which requires all "capital expenditures ... requiring indebtedness of the taxpayers" to be approved by a vote of the people. However, section 85(a) exempts "expenditures of an emergency nature" from the referendum requirement. Because we have upheld the declaration *1178 of emergency, the RPS project is exempt from section 85 of the charter.
(10) Has the City acted in excess of its authority under RCW 35.21.730 by contracting with the PDA to operate the garage?
Appellants also claim the PDA lacks the authority to lease and operate the garage. RCW 35.21.730 allows cities to create public corporations "to improve the administration of authorized federal grants or programs, to improve governmental efficiency and services, or to improve the general living conditions in the urban areas...." Appellants argue the PDA lacks the authority to exist because it serves none of these functions. However, the PDA will undeniably facilitate the administration of the federal EDI grant. It arguably serves the other two purposes as well. Therefore, the City has not acted in excess of RCW 35.21.730.
Appellants also contend the PDA is in violation of RCW 35.21.730(4), which sets forth three potential functions for a PDA: to administer federal grants, receive private assistance, and perform any lawful public purpose. Appellants argue the Spokane PDA is violating this portion of the law because, worded conjunctively, the statute requires a PDA to perform all three of these functions. This argument is meritless. The plain language of the statute states that a city "may" create a public corporation for these varied purposes. Although it is true the word "and" appears in the statute, all three statutory elements need not be present for a PDA to be acting lawfully. Mount Spokane Skiing Corp. v. Spokane County, 86 Wash. App. 165, 173, 936 P.2d 1148 (1997).
(11) Has the City improperly delegated its authority?
Appellants assert without explanation that the City has improperly delegated its authority "to consummate the transactions" identified in the Ordinance. Br. of Appellants at 55. Appellants fail to identify to whom the City has improperly delegated its authority and failed to clarify this point in their Reply Brief, despite the fact that Respondents argued Appellants' argument was unclear. Lacking this basic information, we are unable to address this claim.
(12) Did the trial court err in allowing the Developers to intervene in this case?
Appellants next argue the trial court improperly allowed the Developers to intervene. CR 24(a)(2) allows an interested party to intervene as a matter of right where "the disposition of the action may ... impair ... his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."
Respondents contend that the Developers' interests will not necessarily be protected by the City and the PDA because the interests of the Developers are distinct from those of the City and the PDA. The Respondents reason that, whereas the City is charged with representing the interests of all its residents, the Developers represent a more narrow private interest. Given that the disposition of this action could most certainly impair the Developers' ability to protect their interests, the trial court did not err in allowing the Developers to intervene.
(13) Did the trial court err in exempting from public disclosure an addendum to a report prepared by Coopers & Lybrand?
Appellants also claim the trial court erred in sealing an addendum to a report prepared for the City by Coopers & Lybrand. After reviewing the documents in camera the trial court refused to compel the City to produce the information, finding it was exempt from the scope of the Public Records Act, RCW 42.17.310. RCW 42.17.310(1)(r) exempts from public disclosure "[f]inancial and commercial information and records supplied by businesses or individuals ... during application for economic development loans or program services provided by any local agency."
Where the record consists solely of documentary evidence, the standard of review of a trial court's public disclosure ruling is de novo. Dawson v. Daly, 120 Wash.2d 782, 788, 845 P.2d 995 (1993). The trial court did not err in exempting the addendum *1179 from public disclosure. The addendum is exempt from disclosure under RCW 42.17.310(1)(r) because the project's HUD loan was pending at the time the trial court made its ruling.
(14) Are Appellants entitled to attorney fees?
Appellants ask this court to "fashion a new equitable standard for attorneys['] fees in proceedings of this kind." Br. of Appellants at 57. We decline to do so.
Affirmed.
SMITH, JOHNSON, ALEXANDER and TALMADGE, JJ., concur.
GUY, Justice (concurring).
I concur in the result of the majority opinion. I write separately to explain my position on the issue regarding the emergency clause of the Spokane City Charter. While I dissented in CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996), concerning the Stadium Act and whether raising money for the building of a new baseball stadium was an "emergency," I lost that issue. I now defer to the decision of the majority on this issue. If the funding of a new stadium for the Mariners was valid emergency legislation, then a legislative body's conclusion that the redevelopment and revitalization of a downtown area may also be such legislation. The majority of this Court essentially held in the Mariner's case that the economic welfare of a region may give rise to the kind of "emergency" for which emergency legislation may be validly used. Therefore, we held that when a legislative body decides that the economic welfare of a region is an emergency in a given setting, then the majority of this court will defer to the judgment of that legislative body.
I also write separately to disagree with the conclusion of the dissent that the danger to be remedied in Spokane is not emergent because "the economic decline has already happened." That is not so. Elected officials have a duty to strive to keep alive the economic vitality of their city. The downtown of Spokane is the center of that city and surrounding area. To allow a downtown to lose its business activity is to allow its people to lose their sense of belonging to the community. It is within the duty of city officials to attempt to keep their downtown safe, convenient and economically healthy.
MADSEN, Justice (concurring in the majority).
I agree with Durham, C.J., dissenting, that prior to CLEAN v. State, this Court repeatedly and consistently held in its review of emergency legislation under Const. art. II, § 1(b) that "the declaration to which deference is granted [by the Court] is not the assertion of an emergency itself, but the declaration of the facts constituting the emergency." Dissent at 1180, 1181. However, CLEAN v. State dramatically altered judicial review. This Court declared in CLEAN that it will defer to the assertion of an emergency as long as the facts relied upon by the Legislature in declaring an emergency are not "`obviously false and a palpable attempt at dissimulation.'" City of Tacoma v. Luvene, 118 Wash.2d 826, 851, 827 P.2d 1374 (1992) (quoting State ex rel. Hamilton v. Martin, 173 Wash. 249, 257, 23 P.2d 1 (1933)).
After CLEAN, this Court no longer conducts an independent analysis of whether a law is necessary for the immediate preservation of the public peace, health, or safety within the meaning of Const. art. II, § 1(b). The emergency exception is now coextensive with police powers. I consider this an unfortunate reading of the State Constitution. However, because CLEAN is the law, I must concur with the majority in its result in this case.
SANDERS, Justice (concurring).
Reluctantly I concur with the majority. My greatest reluctance is with issue seven (Majority at 1174) regarding unconstitutional gifts of public funds and issues eight and nine (Majority at 1175-1176) which grant this court's imprimatur to the preposterous notion that a new parking garage for Nordstrom's is "necessary for the immediate preservation of the public peace, health or safety...." Spokane County Charter art. III, § 19(a)(1); compare Const. art. II, § 1(b). *1180 But this result is compelled by the majority decision in CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996) wherein this court virtually repealed the citizens' constitutional right to referendum by allowing the Legislature to inoculate itself against referendums through conclusory emergency clauses not subject to meaningful judicial review, as well as King County v. Taxpayers of King County, 132 Wash.2d 360, 938 P.2d 309 (1997) which emasculated Const. art. VIII, § 7's prohibition against gifts of public funds to private persons by adopting a "legally sufficient" consideration test. See Majority at 1175. Compare Taxpayers, 132 Wash.2d at 393, 938 P.2d 309 (Sanders, J., dissenting). As my objections to both decisions were stated for naught in the accompanying dissents, I concur this case is within the four corners of those majorities and agree stare decisis requires like result in all other cases unless or until these decisions are appropriately overruled to restore that measure of constitutional protection our citizens are justly entitled.
I agree with all of the observations set forth by the Chief Justice in her dissenting opinion, save and except her effort to distinguish CLEAN v. State, which, in my judgment, is fairly indistinguishable. Once the constitutional well has been poisoned, we all must drink from it lest the incentive to correct our mistakes in a principled fashion be lost by inconsistently imposing them.
DURHAM, Chief Justice (dissenting).
I disagree with the majority regarding the validity of the declaration of emergency in the Spokane ordinance at issue. Relying on CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996), the majority concludes that a bare legislative assertion of an emergency, unless obviously false, forecloses the people's referendum right. This court has never granted such deference to a Legislature's conclusory assertion that an emergency exists. Rather, deference is granted only to the declaration of facts that constitute the alleged emergency. It remains a judicial question whether those facts indeed constitute an emergency. Because the Spokane ordinance responds only to a continuing problem of economic decline in the downtown retail area, it cannot be said to address an emergent threat. It therefore fails to state an emergency and should be subject to referendum.

ANALYSIS
The majority relies on some language from CLEAN v. State that at first blush seems to foreclose any inquiry into the validity of a legislative declaration of emergency: "`"Legislative declarations of fact, such as the existence of an emergency, are deemed conclusive unless they are `obviously false and a palpable attempt at dissimulation.'"'"[1] This language, however, must be considered in light of its application in the cases from which it was born. As the forthcoming discussion illustrates, similar language has been used in many of our emergency clause cases.[2] Notwithstanding such broad language of deference, however, this court has routinely invalidated legislative declarations of emergency. We have done so without ever concluding that the Legislature had falsely declared an emergency. This would not be possible were deference granted, as the majority mistakenly believes, to the mere legislative assertion that an emergency exists.
SUMMARY OF OUR EMERGENCY CLAUSE CASES
Were it the case that courts must defer to a declaration of emergency itself, courts *1181 would never need to discuss the factual bases for legislation absent allegations of legislative deceit. Legislative declarations of emergency would rarely, if ever, be contested since the Legislature would need only declare an emergency to foreclose virtually any challenge. Instead, deference has been granted only to the legislative declaration of facts constituting the emergency. This point was expressly made in State ex rel. Hamilton v. Martin, 173 Wash. 249, 23 P.2d 1 (1933), which is the original source of the language in CLEAN v. State regarding the conclusive nature of legislative declarations of emergency.[3]
In Hamilton, this court considered the validity of declarations of emergency in two depression-era acts providing relief in response to state-wide unemployment and poverty.[4] The Legislature declared that "`[d]iscontent, social unrest and incipient insurrection exist. Acts of insurrection are occurring.'"[5] The appellant did not argue that insurrection was insufficiently emergent to suspend the referendum right. Rather, the appellant disputed the Legislature's factual assertion that there was such a degree of social unrest. The court made clear that the courts will defer to legislative declarations of facts constituting an emergency:
We have always held to the rule that the legislative declaration of the facts constituting the emergency is conclusive, unless, giving effect to every presumption in its favor, the court can say that such legislative declaration, on its face, is obviously false and a palpable attempt at dissimulation.[[6]]
Having given conclusive effect to the legislative declaration that insurrection was occurring, it was a simple matter for the court to conclude that insurrection was a sufficiently emergent threat to justify suspension of the referendum right.[7]
In the next three emergency clause cases, the court affirmed this principle by taking legislative declarations of the facts at face value. Yet, the court gave no conclusive effect to the declarations of emergency themselves. Instead, the court invalidated the declarations of emergency in all three cases because the factual bases for the alleged emergencies were not emergent.
First, in State ex rel. Robinson v. Reeves, 17 Wash.2d 210, 135 P.2d 75, 146 A.L.R. 280 (1943), the court considered the validity of a declaration of emergency in an act relating to public utilities funding and operations. In holding the declaration of emergency invalid, the court emphasized that the referendum power is suspended only upon an immediate threat to the public peace, health, or safety.[8] The court concluded that the acquisition and operation of public utilities, while in the public interest, was not an emergency, notwithstanding the Legislature's declaration that it was.[9]
"Promotion of the public welfare" is not a criterion by which we may be guided in determining whether or not an emergency exists which defeats the right to refer the act to the people....
. . . .
To uphold a legislative declaration of emergency such as this would destroy the referendum and would permit the legislature, or a group of electors barely sufficient to invoke an initiative, to impose its will upon the majority in any instance where it is seen fit to attach to an act a declaration of emergency.[[10]]
Next, in State ex rel. McLeod v. Reeves, 22 Wash.2d 672, 157 P.2d 718 (1945), the court invalidated a declaration of emergency in an act amending the game code. The court rejected the suggestion that the amendments *1182 were emergency measures necessary to correct an alleged constitutional problem with the then existing code.[11] Again, the court emphasized that it is a judicial question whether the factual bases for legislation constitute an emergency.[12] The court concluded that the need to reorganize the game commission was not sufficiently emergent to suspend the referendum right.[13]
Then, in State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 157 P.2d 721 (1945), the court invalidated a declaration of emergency in an act regarding the administration of state timber resources. The court rejected arguments that the act was immediately necessary as an economic measure to quash duplicative timber management functions and to consolidate control over timber resources.[14] The court expressly held that the referendum right could not be defeated by the mere declaration of emergency:
We think it too clear to require argument that the legislature cannot defeat the constitutional right, reserved by the people... by merely inserting in an act....
"This act is necessary for the immediate preservation of the public peace, health and safety...."[15]
Notwithstanding the beneficial nature of the act, it did not address an emergent threat and was, therefore, subject to referendum.[16]
This brings us to State ex rel. Pennock v. Reeves, 27 Wash.2d 739, 179 P.2d 961 (1947), in which the court erroneously stated in dictum that conclusive effect is given to a legislative declaration of emergency itself. In Pennock, the plaintiff sought a writ of mandate to compel the Secretary of State to accept filings for referendum against parts of two amendatory welfare acts. The court held, on the only issue before it, that when any portion of a law addresses an emergency, the entire law is immune from referendum.[17] Since the plaintiff conceded that the appropriations provisions of the acts were emergent and in support of an existing state institution,[18] his writ was necessarily denied. Yet, the court went on to state in dictum:
In each of the statutes in the cases at bar is a declaration that the act is necessary for the immediate preservation of the public peace, health, and safety. We have consistently held that such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. State ex rel. Hamilton v. Martin, 173 Wash. 249, 23 P.2d 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption.[[19]]
In doing so, the court misstated the rule it cited from Hamilton. As discussed earlier, the Hamilton court stated that the court had always given conclusive effect to legislative declarations of facts constituting an emergency, and the Kennedy court expressly rejected the suggestion that the declaration of emergency itself was given conclusive effect.
Fortunately, there is no precedential effect to this misstatement because the doctrine of stare decisis does not apply to language that is unnecessary to the conclusion reached.[20] It is well established that the precedential effect of such general statements is confined *1183 to the facts and issues before the court.[21] The plaintiff never challenged the validity of the declarations of emergency; indeed, he conceded their validity. He sought only to subject the nonemergency provisions of the acts to referendum. Thus, the court's misstatement, though often repeated, is not binding authority.
Unfortunately, this court has often turned, ill advisedly, to Pennock for the scope of judicial deference in emergency clause cases. However, subsequent emergency clause cases purporting to apply this rule from Pennock, up to and including CLEAN v. State, make clear that the declaration of emergency itself is given no conclusive effect. Rather, in order for the court to uphold the validity of a declaration of emergency, there must be facts that are legally sufficient to constitute an emergency. This court has not hesitated to hold legislation subject to referendum despite a legislative declaration of emergency when the facts did not demonstrate an emergent threat to the public.
In the next emergency clause case after Pennock, this court struck down a declaration of emergency in a city ordinance much like the present one. At issue in State ex rel. Gray v. Martin, 29 Wash.2d 799, 189 P.2d 637 (1948) was a Tacoma ordinance authorizing the purchase of property to construct a municipal airport. The ordinance stated that a public emergency existed and that in order to provide adequate transportation facilities it was imperative that the ordinance take effect immediately. Like the Spokane charter in the present case, the Tacoma charter provided for suspension of the referendum right upon a declaration of emergency in an ordinance. The City argued that the declaration of emergency was conclusive since it was not obviously false on its face and there were no judicially noticeable facts indicating falsity.[22] The ordinance at issue provided in relevant part:
Section 4. That in order to provide adequate transportation facilities for the inhabitants of the City of Tacoma and for the support of the City government it is imperative that the provisions of this ordinance become effective without delay and by reason thereof a public emergency is hereby declared to exist making it necessary that this ordinance take effect immediately after publication and that the same shall take effect immediately after publication.[[23]]
The court quoted the Pennock court's assertion that a legislative declaration of emergency is conclusive unless obviously false.[24] Nevertheless, the court invalidated the declaration of emergency, holding that the ordinance failed to state an emergency.[25]
In doing so the court clarified that the declaration to which deference is granted is not the assertion of an emergency itself, but the declaration of the facts constituting the emergency. Therefore, no weight was given the city council's opinion that the public transportation need was emergent. Rather, the court concluded that the ordinance, by failing to declare facts that constituted an emergency, failed to declare any emergency to which deference could be granted.
The Gray court explained that an emergency is that "which calls for immediate action or remedy; pressing necessity; exigency; *1184 a sudden or unexpected happening."[26] Although the ordinance stated facts regarding the need for public transportation, there were no facts that explained why public transportation was so inadequate that emergency measures were required:
[T]he ordinance contains no statement that a public emergency exists with reference to transportation facilities in Tacoma. True, the statement "to provide adequate transportation facilities" may be interpreted to imply that there is a need for such facilities; but the statement does not declare, nor can it be construed to mean, that the transportation facilities in Tacoma are so insufficient or inadequate as to require immediate additional facilities.[[27]]
The court adhered to this principle in its next emergency clause case by striking down yet another legislative declaration of emergency. In State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 380 P.2d 735 (1963), the court attempted to clarify the ambiguity created by the Pennock dictum. At issue was the validity of a declaration of emergency in an act authorizing certain gambling activities. The court noted that "[i]t would be inaccurate to say that our former decisions have been consistent in discussing and announcing the rule to be applied."[28] By way of example, the court quoted the Pennock court's overstatement of the rule.[29] In holding the declaration of emergency invalid, the court then clarified that no conclusive effect is given the declaration of emergency itself:
The touchstone of the rule is "... what appears upon the face of the act, aided by the court's judicial knowledge."
The face of the act is patently devoid of any facts relating to an emergency (with the exception of the emergency clause itself).... We do not indicate that the inclusion of a legislative declaration of policy in an act would, ipso facto, remove the emergency clause from the ambit of the court's constitutional duty to project and test the clause upon the backdrop of the constitution.[[30]]
The court could hardly have been more clear in its rejection of the idea that the declaration of emergency itself is entitled to deference:
"[T]he legislature has no right to tack an emergency clause onto an act in order to prevent the people from exercising their right of referendum, unless that act is clearly within the exception set forth in the amendment."[[31]]
The next time (and last time before CLEAN v. State) that this court considered a challenge to a declaration of emergency was in an appeal from a conviction for drug loitering. In City of Tacoma v. Luvene, 118 Wash.2d 826, 827 P.2d 1374 (1992), the defendant challenged the ordinance on overbreadth, vagueness, and preemption grounds. A minor issue was the defendant's novel argument that an invalid declaration of emergency rendered the drug loitering ordinance unenforceable. The court stated that legislative declarations of fact, including declarations of emergency, are conclusive unless "`obviously false and a palpable attempt at dissimulation.'"[32] In doing so, the court repeated the error of the Pennock court by incorrectly paraphrasing State ex rel. Hamilton v. Martin, 173 Wash. 249, 23 P.2d 1 (1933). Yet, in upholding the declaration of emergency the court did not simply defer to the declaration of emergency, but looked to the facts constituting the emergency. The ordinance provided, in part:

*1185 "That time is of the essence in this matter because the City's drug problems are increasing rapidly, causing imminent danger to the public health and safety and to property in the area where drug use is taking place...."[[33]]
The court concluded that there was no falsehood or dissimulation behind the factual assertion of the City's rapidly increasing drug problems. It was clear, therefore, that such a threat was sufficiently emergent to validate the declaration of emergency.
This brings us to CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996), upon which the majority relies for the proposition that a legislative declaration of emergency itself is conclusive. In CLEAN v. State, the court was asked to evaluate the validity of a declaration of emergency in a financing act for the new Seattle Mariners major league baseball stadium. The court cited to both Humiston and Luvene for the proposition that legislative declarations of emergency are conclusive unless obviously false.[34] Yet, as this court had done in every emergency clause case, the inquiry did not end with the legislative declaration of emergency. Instead, the court acknowledged "[t]he more knotty question" of whether the financing act was immediately necessary, before independently evaluating whether the factual underpinning of the declaration of emergency were legally sufficient to constitute an emergency.[35] The court noted that the Mariners had informed the King County Executive that without a new stadium the Mariners would be offered for sale after October 30, 1995.[36] With only a few weeks to act, on October 11, 1995, the governor called a special session of the Legislature solely to address financing for a new stadium.[37] The session concluded a week later when the Legislature adopted a financing act, which included a declaration of emergency.[38] The court was satisfied that the Legislature acted in response to a "clear and present danger" that the State's only major league baseball team would be lost without prompt action.[39]
Thus, this court has never given conclusive effect to the assertion of emergency itself. To do so would be to abdicate our duty to evaluate the constitutionality of legislative action. It would be no different than deferring to a legislative declaration that an act were necessary to further a compelling state interest. Instead, this court has upheld declarations of emergency only when the facts established a need for immediate response to public peril.
THE SPOKANE ORDINANCE FAILS TO DECLARE AN EMERGENT THREAT
It is apparent that the factual underpinnings of the Spokane ordinance do not constitute an emergency. Of course, we should give conclusive effect to the Spokane City Council's declaration of the facts constituting the emergency. We should accept as true that the downtown area has suffered an economic decline and that the ordinance will revitalize the area.[40] We should also accept as true that the developer must immediately execute leases to commit tenants to the project in order for the project to go forward.[41] Yet, the danger to be remedied is not emergent because the economic decline has already happened.
Although the revitalization of downtown, like the construction of an airport in Gray, may be a project in the interest of improving the public welfare, it is not necessary for the immediate preservation of the public welfare. The failure of the project to proceed would not alter the status quo; it would be *1186 merely a lost opportunity to remedy what appears to be a long-standing problem. Thus, the Spokane ordinance is nothing more than an economic stimulus plan precisely of a type upon which the Spokane taxpayers should be allowed to vote. As the Gray court observed:
[The city council] must set forth in the ordinance a statement specifying not a mere conclusion, nor merely the purpose of the ordinance, but an actual existing public emergency. To hold otherwise would be to nullify the power withheld by the people of the city ... when they provided for a referendum in their city charter, for it would mean a waiver of their express right to referendum whenever their city council chose to declare a certain situation an emergency.[[42]]

CONCLUSION
Despite the majority's assertion to the contrary, this case is in stark contrast to CLEAN v. State, where there was an immediate threat that the State could lose its only major league baseball team and the Legislature took the extraordinary action of calling a special legislative session solely to address this impending threat. There is no similarly impending threat in the present case. Even giving conclusive effect to the Spokane City Council's concern that the project would fall through without immediate action, a potentially missed opportunity to correct a long-standing problem is not an emergency. The declaration of emergency in the ordinance, therefore, is legally insufficient to suspend the right of referendum the citizens of Spokane reserved to themselves in their city charter.
NOTES
[1] Majority at 1176 (quoting CLEAN v. State, 130 Wash.2d, 782, 808, 928 P.2d 1054 (1996) (quoting City of Tacoma v. Luvene, 118 Wash.2d 826, 851, 827 P.2d 1374 (1992) (quoting State ex rel. Hamilton v. Martin, 173 Wash. 249, 23 P.2d 1 (1933)))).
[2] There are two separate exceptions to the people's referendum right: one for laws necessary for the immediate preservation of the public peace, health, or safety; and another for laws in support of the state government and its existing public institutions. See CLEAN v. State, 130 Wash.2d at 804 n. 7, 928 P.2d 1054 (discussing Const. art. II, § 1(b)). Since this case involves application of the first exception only, my discussion of our relevant case law will be confined to those emergency clause cases addressing the first exception. As the majority correctly points out, the standard for evaluating declarations of emergency in state legislation is equally applicable to the city ordinance in the present case.
[3] See supra note 1.
[4] State ex rel. Hamilton v. Martin, 173 Wash. 249, 251-54, 23 P.2d 1 (1933).
[5] Hamilton, 173 Wash. at 256-57, 23 P.2d 1 (quoting Rem.Stat. § 9992 (Supp.1933)).
[6] Hamilton, 173 Wash. at 257, 23 P.2d 1 (emphasis added).
[7] Hamilton, 173 Wash. at 259, 23 P.2d 1.
[8] State ex rel. Robinson v. Reeves, 17 Wash.2d 210, 215-16, 135 P.2d 75 (1943).
[9] Robinson, 17 Wash.2d at 216-17, 135 P.2d 75.
[10] Robinson, 17 Wash.2d at 217, 135 P.2d 75.
[11] State ex rel. McLeod v. Reeves, 22 Wash.2d 672, 675, 157 P.2d 718 (1945).
[12] McLeod, 22 Wash.2d at 674, 157 P.2d 718.
[13] McLeod, 22 Wash.2d at 674-75, 157 P.2d 718.
[14] State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 682-83, 157 P.2d 721 (1945).
[15] Kennedy, 22 Wash.2d at 681, 157 P.2d 721 (quoting Laws of 1945, ch. 202, p. 579) (emphasis in original).
[16] Kennedy, 22 Wash.2d at 682-84, 157 P.2d 721.
[17] State ex rel. Pennock v. Reeves, 27 Wash.2d 739, 743, 179 P.2d 961 (1947).
[18] Pennock, 27 Wash.2d at 741, 179 P.2d 961.
[19] Pennock, 27 Wash.2d at 743-44, 179 P.2d 961.
[20] In re Electric Lightwave, Inc., 123 Wash.2d 530, 541, 869 P.2d 1045 (1994).
[21] In re Estate of Burns, 131 Wash.2d 104, 113, 928 P.2d 1094 (1997).
[22] State ex rel. Gray v. Martin, 29 Wash.2d 799, 805-06, 189 P.2d 637 (1948).
[23] Gray, 29 Wash.2d at 802-03, 189 P.2d 637 (quoting Tacoma Ordinance 13082 (Apr. 16, 1947)) (emphasis omitted).
[24] "We have consistently held that such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. State ex rel. Hamilton v. Martin, 173 Wash. 249, 23 P.2d 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption."

Gray, 29 Wash.2d at 804, 189 P.2d 637 (quoting Pennock, 27 Wash.2d at 743-44, 179 P.2d 961).
[25] Gray, 29 Wash.2d at 806, 189 P.2d 637.
[26] Id. (quoting State ex rel. Porter v. Superior Court, 145 Wash. 551, 559, 261 P. 90 (1927)).
[27] Gray, 29 Wash.2d at 808, 189 P.2d 637 (emphasis in original).
[28] State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 778, 380 P.2d 735 (1963).
[29] Humiston, 61 Wash.2d at 778, 380 P.2d 735 (quoting State ex rel. Hoppe v. Meyers, 58 Wash.2d 320, 326, 363 P.2d 121, 100 A.L.R.2d 304 (1961) (quoting State ex rel. Pennock v. Coe, 42 Wash.2d 569, 257 P.2d 190 (1953) (quoting Pennock, 27 Wash.2d at 743-44, 179 P.2d 961))).
[30] Humiston, 61 Wash.2d at 778, 380 P.2d 735.
[31] Humiston, 61 Wash.2d at 776, 380 P.2d 735 (emphasis in original).
[32] City of Tacoma v. Luvene, 118 Wash.2d 826, 851, 827 P.2d 1374 (1992) (quoting State ex rel. Hamilton v. Martin, 173 Wash. 249, 23 P.2d 1 (1933)).
[33] Luvene, 118 Wash.2d at 851, 827 P.2d 1374 (quoting Tacoma Ordinance 24167 § 2).
[34] CLEAN v. State, 130 Wash.2d 782, 807-08, 928 P.2d 1054 (1996).
[35] CLEAN v. State, 130 Wash.2d at 807, 928 P.2d 1054.
[36] CLEAN v. State, 130 Wash.2d at 788, 928 P.2d 1054.
[37] Id.
[38] CLEAN v. State, 130 Wash.2d at 790-92, 928 P.2d 1054.
[39] CLEAN v. State, 130 Wash.2d at 808-09, 928 P.2d 1054.
[40] Majority at 1176 (quoting Spokane Ordinance C31823 (Jan. 27, 1997)).
[41] Id.
[42] Martin, 29 Wash.2d at 808-09, 189 P.2d 637.